No. 68.—ALEXANDER J. ROBINSON, plaintiff in error, *vs.* RICHARD H. LANE, defendant in error.

[1.] One of a company of stockholders, who participated in the illegal organization of a bank, upon a spurious and not a specie basis, as required by the charter, cannot, under the individual liability clause, maintain a suit upon the unpaid bills of the bank, against another stockholder ; and evidence is admissible to show the fraudulent manner in which the bank was put into operation.

[2.] Concomitant or contemporaneous declarations, are admissible in evidence, as forming part of the *res gestæ*, and showing the character of the principal fact.

[3.] Where the amount of the outstanding circulation of a bank is a fact necessary to be ascertained, any evidence should be received, which aids in fixing that fact.

[4.] Where the shares of a bank are transferred by A to B, without consideration, and without the knowledge or consent of B, B is not the *owner,* in contemplation of the charter, and can only be made liable on the ground of fraud, viz: acquiescing in the transfer, after the fact is brought to his notice, for the benefit of some other person, and to the injury of the creditors of the corporation.

[5.] By the 11th section of the charter of the Planters' & Mechanics' Bank of Columbus, it is provided, that "The persons and property of the stockholders, shall be pledged and held bound in proportion to the amount of shares and value thereof, that each individual or company may hold in said bank, for the ultimate redemption of the bills or notes issued by said bank, in the same manner as in common actions of debt:" *Held,* that the aggregate body of stockholders are liable, under this clause, for *all* the bills issued by the bank; and that the liability of each is to be ascertained and fixed by the following proportion, namely: as the whole capital stock is to the entire outstanding circulation, so is each stockholder's share to his part to be redeemed.

[6.] In fixing the ownership of stock, it is not competent to give in evidence the declarations of the officers and agents of the bank, for that purpose. Third persons are not bound by their sayings.

[7.] It is not proper, in order to screen a stockholder from responsibility, under an individual liability clause in a bank charter, to prove that assets sufficient to pay the creditor were turned over by the corporation to an assignee, chosen and selected by itself, and over whom the corporation had, by law, co-ordinate control with the creditors.

[8.] Conceding the Common Law rule, that upon the dissolution of a corporation, the debts due to and from it are extinguished, still, it is competent for the Legislature to interpose and prevent such a result; and having done so, it is not in the power of the Courts to render a judgment, contravening the declared will of the Legislature; any such attempt would be an excess of jurisdiction, which would render its proceedings certainly voidable, if not absolutely void.

[9.] Where a subsequent Statute purports, by its title, to be amendatory of several others which have preceded it, alterations in the body of the Act of those which had gone before, either by excisions, additions or substitutions, create no discrepancy between the Act and its title.

Debt, in Muscogee Superior Court. Tried before Judge WORRILL, June Term, 1855.

This was an action brought in the name of Richard Lane

*vs.* Alexander J. Robinson, for the redemption of certain bills of the Planters' & Mechanics' Bank of Columbus. On the trial, Ragan, the assignee of the bank, stated that he did not know the amount of bills in circulation; had within his control about $69.000; had received from J. A. Lee about $75.000. Defendant proposed to prove what Lee said when he delivered up the bills. The Court refused to admit this testimony, and defendant excepted.

The transfer book was given in evidence, showing four hundred and twenty-five shares of stock transferred to defendant by H. L. Smith, as agent for other stockholders. Defendant proved by the cashier, that defendant was absent from the State at the time these transfers were made; that when the semi-annual report was published, giving his name as a stockholder to this extent, defendant came to him and expressed surprise, and objected thereto; that witness told him it was done for the benefit of D. McDougald. Defendant and McDougald afterwards had an interview in presence of witness, when defendant told McDougald that stock must be transferred to some one else. This was not done, however, until June, 1841, when the same was transferred by defendant to the bank. Defendant never took a certificate for this stock, or received any dividends thereon. At the time of the final failure of the bank, the circulation amounted to $228.946.

S. R. Bonner testified: That he owned $1500 of the bills sued on in this case; that he was one of the original stockholders.

Defendant then proposed to prove that the original organization of the bank was illegal, and in violation of law and of the charter. The Court refused to hear the evidence, and defendant excepted.

Wm. Dougherty testified: That he knew of $160.000 of bills in circulation, of which $104.000 belonged to the Bank of Columbus. Defendant then gave in evidence the judgment of forfeiture against the bank, rendered at June Term, 1843.

Defendant then gave in evidence the deed of assignment to R. Alexander, and proposed to show that the assignee wasted the assets, which were amply sufficient to pay the liabilities. The Court rejected the evidence, and defendant excepted.

Defendant proposed to prove, that the bills held by the Bank of Columbus were received by them on deposit, under a contract with John Banks, James M. Chambers and A. H. Flewellen, three of the directors and large stockholders of the P. & M. Bank—they giving bond to redeem the same and pay interest on such deposit; and farther, that these bills were an excessive issue, in violation of law, and within the knowledge of the Bank of Columbus, who was *particeps criminis* in the said illegal issue; and consequently, these bills form no part of the outstanding circulation of the P. & M. Bank. The Court rejected this evidence, and defendant excepted.

The Court charged the Jury, that they "must be·satisfied that the plaintiff is holder and owner of the bills sued on; that it mattered not if $1500 of them did belong to S. R. Bonner, unless the defendant had pleaded and proved a good and legal set-off against the said Bonner; not having done so, the plaintiff must recover on that point." "You must also be satisfied that the defendant is a stockholder in the P. & M. Bank. The transfer book is evidence to that point." As to defence set up by defendant, as to the shares transferred to his name without his consent, the Court said : "The duty which the defendant owed to himself and the public, required that he should have had it immediately cancelled ; and if you believe he did not do so, then he is liable for the same. Furthermore, the cashier was not the proper person to whom the defendant should have complained,—to the President and Directors he should have gone, and repudiated the transfers, and had the matter set right. If he did not do this, and suffered his name to be published again and again as the owner, he is liable on the stock as if he were the owner."

"To ascertain the liability of the defendant, you must determine the amount of his stock. If that amount exceeds

the bills sued on, you will find a verdict for the whole amount of the bills, with interest from the time of filing the declaration."

To each and all of these charges, defendant excepted.

Defendant requested the Court to charge, among other things, as follows:

1. That the stockholders, if liable at all, are held and bound in proportion to the number of shares, and the value thereof, owned by each; that the plaintiff must prove the amount of his liability, in order to recover. The proportionate liability of defendant can only be ascertained by ascertaining the whole liability of the bank at this time.

2. That if the Jury believe that defendant was not, in fact, the owner of the 475 shares transferred to him, then he is not liable on said stock, unless the plaintiff shall prove that the defendant allowed the stock to remain in his name, to defraud and deceive the public.

The Court declined to charge as requested, and defendant excepted.

B. HILL; H. HOLT; S. JONES, for plaintiff in error.

W. DOUGHERTY, for defendant in error.

The Court not being unanimous, the Judges delivered their opinions *seriatim.*

*By the Court.*—LUMPKIN, J. delivering the opinion.

I propose to write a brief opinion in this case, not because the points adjudicated are unimportant, but for the simple reason that a decision in these bank cases settles nothing. I am warranted in saying this from the experience of the past six years. With every change in the Court, the same questions are re-produced for re-adjudication. And we are authorized to infer, that this practice, so subversive of the fun-

damental object for which this tribunal was organized, is to continue so long as this litigation shall last. Why should I or any other Judge, under these circumstances, spend his time and strength for naught?

[1.] The first error assigned, is in ruling out the testimony of Ragan and Bonner, as to the illegal and fraudulent organization of the Planters' & Mechanics' Bank of Columbus, and the participation therein of Bonner.

Counsel for defendant in error confess that the Court was wrong in excluding this evidence, and state, by way of explanation, that the decision of this Court in *Anne E. McDougald, adm'x, vs. Bellamy, adm'r of Bailey*, at Americus, July, 1855, was not known when the bill of exceptions in this case was certified.

[2.] Was the Court right in rejecting the sayings of Lee, when he delivered a packet of the bills of the bank to Ragan, the assignee, showing from whom and where he obtained them? We think not, and upon the authority of *Lockhart & Thomas against McNabb*, decided last summer, and not yet reported.

Here the main fact is the delivery of the money by a third person to the assignee. Without something explanatory, the transaction is unintelligible. Should not the concomitant declarations of the actor, Mr. Lee, be received as to the place where, and the person from whom, he obtained these bills, as well as the directions given as to the disposition to be made of them? Admit this proof, and the transaction is illustrated and understood. Reject it, and it is stultified. We see the packet handed over, but for what purpose or with what intent, we are left in utter darkness.

[3.] Once concede that the amount of the outstanding circulation is a necessary element in ascertaining the stockholder's liability, and we hold that it is; and it follows, of course, that every inquiry is legitimate and proper which aids in the investigation of that fact. It is argued, with great earnestness, that to permit these collateral issues, is to defeat the possibility of a recovery; and consequently, is a practical

denial of justice. At this distant day, since the bill-holder's right to sue accrued, it may possibly have the effect of driving him *into* Equity, or even *out of* Court. That is not the fault of the law.

But what insurmountable obstacle exists in this case more than in others? From first to last, there has been a factitious importance attached to these bank cases, which does not intrinsically belong to them. What are they more than others, either in principle *or dollars*, that they should disturb the equanimity of the Court, and compromit its dignity by the petty personalities of Counsel; that they should consume, to such an unreasonable extent, the time of the country; that they should be invoked to make and unmake Judges, and convulse the State from one end of it to the other? The fund of an insolvent is to be distributed—what a number and variety of issues must be formed, before the *quota* to which each creditor is entitled can be ascertained? But a suit at Law against an executor or administrator, is a strictly analogous proceeding. The trustee is sued by a creditor of the testator or intestate. He pleads, amongst other things, outstanding debts against the estate, of equal or higher dignity, of which he has been notified. Have not each of these claims to undergo a legal investigation, before a judgment, *quando* or *præter*, can be rendered? And yet, this is a practice of daily occurrence in our Courts. We have no doubt the difficulty of determining the outstanding circulation is greatly exaggerated in the imagination of Counsel. But be this as it may, the principle is a plain one.

(4.) As to the 475 shares upon which it is sought to make Robinson liable, the evidence shows that this stock was transferred to him without his knowledge or consent, and without consideration; and that if he held it all, it was for the benefit of McDougald. Robinson, therefore, can only be made liable on the ground of fraud. If the Jury should believe, from the proof, that after the fact was brought to his knowledge, that the stock stood in his name, he acquiesced in the transfer for the accommodation of McDougald, then he is presumptively

liable for the bills issued, before he re-transferred the stock to the bank; and, *prima facie*, he is not liable on bills issued after that time.

Fraud is a question of fact, to be deduced by the Jury, in this as in all other cases, from all the circumstances connected with the transaction.

The transfer book, we think, was properly admitted to go before the Jury. And its materiality was strengthened in this case, inasmuch as Robinson subsequently re-conveyed to the bank—thus acknowledging, that by virtue of the transfer, the legal title to the stock was in him; and that the bank recognized him as the owner. We do not intend to say—indeed, our opinion is to the contrary—that had Robinson stood aloof entirely from the business, that the mere fact of the stocks being transferred to his name, would, *per se*, have involved him in any liability whatever.

(5.) We hold there is error in the next assignment, as to the extent of the defendant's liability. It is the opinion of this Court, that the aggregate body of stockholders, are liable under the charter, for *all* the bills issued by the bank; and that the liability of each is to be ascertained and fixed by the following proportion, namely: as the whole capital stock is to the entire outstanding circulation, so is each stockholder's shares to his part to be redeemed.

We think there can be no doubt but that it was the intention of the Legislature to make the stockholders ultimately liable to redeem *all* the bills or notes issued by the bank. Such is the very language of the charter. Grant this and the argument is at an end; for it follows irresistibly, that each stockholder's liability to take up the unpaid bills of the bank, is in proportion to the number of shares which he holds of the capital stock. For myself, I never felt clearer in any conclusion.

Having thus succinctly disposed of the five grounds upon which the judgment of the Circuit Court must be reversed, we shall, with all possible brevity dispatch the remaining points in the record.

Robinson *vs.* Lane.

[6.] Was it error in the Court to disallow proof as to whom the bank recognized as the owner of the 475 contested shares of stock in the bank? Had the proposition have been to show that dividends were paid to Robinson, or that he voted as a stockholder, or performed other acts upon the faith of those shares, the question would have been different. We have already said that the bank treated him as the legal owner, by taking his assignment. But this was an act. We do not see by what rule we could let in the declarations of the bank, through its agents and officers, to the prejudice of third persons.

[7.] How far are bill-holders to be affected by the assignment made by the bank and ratified by the Legislature? The position occupied by Counsel for the stockholders is, that if assets sufficient in amount and value, were turned over to the assignee to redeem the circulation, and the same have been wasted, the stockholders are discharged.

It might well be questioned, whether the assignment made by the bank ever was *accepted* by the bill-holders, in the legal sense of that term. But conceding that it was, the bill-holder, as the evidence shows, pursued his remedy *at Law*, upon his judgment against the assignee, to every available extent; and the proof of this is, a return of *nulla bona* on the *fi. fa.* by the proper officer for executing the same. And having done this, and the bill-holder under the charter having a speedy, direct and certain redress against the stockholder himself, the latter cannot require the former to look to any other source for payment. This point is virtually covered by *Lane against Thornton*, (11 *Ga. R. beginning at page* 513 *et sequitur.*)

But it is argued by Mr. Hill with his usual ability, and who raises no question as to the validity of the assignment, that the bill-holders having, by their neglect, suffered the corporate effects to be lost, the stockholders who occupy the position of sureties, are discharged, and much authority is cited in support of this proposition. But no precedent has

been produced, and none, I feel quite certain, can be found. which comes up to this case.

I admit, that if property be assigned by the principal debtor, directly to the creditor, and it be wasted, there would be justice in the claim set up to exoneration, by the surety. But here the assets are transferred to a third person—one chosen and selected by the corporation, and over whom the the stockholders had equal power (I doubt not, *in fact,* far more) with the bill-holders, if not by the form of the deed, yet, by operation of law. The stockholders were not only interested in seeing this fund properly applied to discharge the primary liabilities of the bank, but they were entitled to the residuum should there be a surplus. Why did they not come into Equity and complain that Alexander, the assignee, was not discharging his duty? That he was suffering the assets to be squandered; and that in consequence thereof, they were likely to be damnified? On the contrary, no fault is found—no complaint heard. Judge STURGES, we are told in the argument, held that the Legislature had no power to save the debts due to and from the bank from extinguishment; that the debtors of the bank had a constitutional right which could not be impaired, of being released from the performance of their obligations. And that Judge Alexander treated the whole matter, assignment and all, as a nullity; and hence, refused to execute the trust which he voluntarily assumed.

And thus, funds now alleged to have been amply sufficient to satisfy all these demands, were permitted to be wasted. And the doctrine is, that the bill-holders, with no notice by the stockholders to look after this property, and with co-ordinate power to do so themselves, are barred from pursuing their statutory remedy!

[8.] The next error assigned is, the refusal of the Court to charge the Jury, that by the judgment of forfeiture, the debts due by the bank were extinguished.

This Court having repeatedly, within the last six years, assigned reasons for entertaining the same opinion as that

Robinson *vs.* Lane.

held by our brother WORRILL upon this point, I am content to rest my judgment of affirmance, in the present case, upon the past argument. (8 *Ga. Rep.* 468; *Ib.* 486; 11 *Ib.* 458; 16 *Ib.* 289.)

My mind has never wavered for a moment upon this question, whether considered upon general principles or upon our own special legislation relative to the subject.

In *Thornton vs. Lane,* (11 *Ga. Rep.* 493,) in speaking of the odiousness of the antiquated Common Law rule, that upon the dissolution of a corporation, the debts due to and from it are extinguished, and which, thank God, I have lived to see itself *extinguished,* by an authority not subject to review, I remarked that "Georgia is not obnoxious to this reproach, so far as this corporation" (the P. & M. Bank of Columbus) "and others in its vicinity, *in pari delicto,* are concerned. She has made ample provision to rescue *them* from the operation of this rule."

Let us glance, for a moment, at some of the enactments upon this head. I shall not attempt an analysis or collation of all of them.

The Act of 1840 (*Cobb,* 115) contains this explicit provision: "And in case any of said banks, their branches or agencies, shall then and thereafter" (that is, after the 1st day of February, 1841,) "fail or refuse to comply with and perform the requirement aforesaid promptly," (pay specie on their bills,) "then his Excellency, the Governor, on due proof thereof, is hereby authorized and required to cause judicial proceedings to be instituted, forthwith, against such defaulting bank, in the Superior Court of the county where the same is located, to the end that the charter of such bank may be declared as forfeited and annulled; *and that the assets of the same be immediately placed into the hands of a receiver, under adequate security, for the benefit of the creditors thereof.*"

Under this Act, judicial proceedings were instituted against the P. & M. Bank, to forfeit its charter, on account of its failure to redeem its notes in specie. But as hope was held

out that the bank would resume specie payments, in the winter of 1841, another Statute was passed authorizing and requiring the Governor to arrest the prosecution, provided the bank would commence to redeem its liabilities by the 1st of January, 1842, and should continue to do so thereafter. (*Cobb*, 117.)

But the promise of resumption proving delusive, the Legislature again, in 1842, enacted that, "in all cases where judicial proceedings had been commenced by the State against this and other banks, which had become amenable to the provisions of the Act of 1840, and which had failed to comply with the requirements of the Act of 1841, upon the final trial of such proceeding and the rendition of a verdict, upon which a judgment of forfeiture should be pronounced, the Judge should pronounce the judgment of dissolution for all purposes whatsoever, saving and excepting as to its power, in its corporate name, to collect and pay its debts, and to sell and convey its estate, real and personal, which power should be exercised by the receiver or receivers, whose appointments are herein provided for, in the name of said corporation, subject to no control whatever by the corporation or its officers. No inference can properly be drawn from this nor any other expression, in any of these Acts, adverse to the stockholders' right to interfere, legally, to protect their interest. Their right to do this, resulting from their liability under the charter, could not be divested, even by the Legislature, had it been attempted. And it was made the duty of the *Governor*, on being notified thereof, by the Judge before whom the case was determined, to appoint three competent persons as receivers, whose duty it should be to take charge of and collect, as early as practicable, the debts and demands due and owing to said bank; and to pay off and discharge its liabilities, and to turn over the balance of the assets to the stockholders, in proportion to the amount of stock held by them." (*Cobb*, 118, 119.)

In May, 1843, just before the judgment of forfeiture was rendered, the bank made a regular assignment of all its pro-

perty, real and personal, and of all its debts, credits and effects, for the benefit of all its creditors. And no receiver having been appointed by the Governor, under the Act of 1842, because none could be found willing and competent to act, the Legislature at its next session in December, 1843, ratified and confirmed the assignment made by the bank, declaring that it should be taken, held and considered, valid for all purposes, both in Law and in Equity. And the assignee, Robert B. Alexander, was authorized to sue and be sued, in his said character, for any demand due to and from said corporation. (*Cobb*, 120, 121.)

And yet, in the face of all this legislation and of this assignment by the bank, before its charter was forfeited and of the legislative confirmation thereof, it is insisted that the liabilities of the corporation, and consequently, the personal liability of the stockholders, is extinguished! and wherefore? Suppose it be true that the debtors of the bank, and the stockholders contracted in reference to the Common law rule? Is it not equally true that they contracted also in reference to the acknowledged right of the Legislature to rescue the assets from this principle? And is not the one to be taken as much an element of the contract as the other?

But while it is not disputed that the Legislature had the power to interpose and prevent the operation of the Common Law rule, and that they have exercised the right, as is clearly shown in the foregoing quotations, yet, it is contended, that by the judgment of forfeiture, upon the *quo warranto* rendered against the bank, that all the debts due to and from the institution were extinguished.

I have endeavored, and I trust successfully, to demonstrate on a former occasion, that conceding this to be true, it does not affect or impair, in the slightest manner, the collateral undertaking of the stockholders under the 11th section of the charter. (16 *Ga. R.* 289.) I am content to submit that opinion, and upon it my judicial reputation, to the test of time and the scrutiny of the professional world, and to be judged accordingly.

Robinson *vs.* Lane.

But waiving this view of the subject, what was the judgment of the forfeiture pronounced by the Superior Court of Muscogee County, against the Planters' & Mechanics' Bank of Columbus? It is in these words: "It is considered by the Court, that the liberties, privileges and franchises, to-wit: that of being a body politic and corporate, by the name and style of the Planters' & Mechanics' Bank of Columbus, heretofore used, enjoyed and exercised by the defendant, be seized into the hands of the State, and that the said defendant do not, in any manner, hereafter intermeddle, use, have, enjoy or exercise, any of the liberties, franchises or privileges of a body politic or corporate, but that the defendant be absolutely prejudged and excluded from holding, using or exercising any of the privileges, franchises or liberties of a body politic or corporate, and that the State recover its costs, to be taxed," &c.

Suppose it be true, that apart from the Acts of 1840, 1841, 1842 and 1843, the debts due to and from the bank would have perished with the corporation, how can it be pretended that they are not saved by the Statutes? Does this judgment assume to disregard the law, as has been suggested, on account of its supposed unconstitutionality? We deny that it admits of any such construction; and we must interpret it by itself, and not from tradition. We hold that the judgment is precisely what it should have been, both in form and substance.

The Act of 1840 directed a judgment of forfeiture to be rendered against this and other defaulting banks, upon failure to pay specie at a stipulated period. But the same Act rescued the assets by providing that they should immediately be placed in the hands of a receiver. The Act was silent as to who should appoint the receiver; and therefore, a question may have been raised as to the necessity of the further action of the Court. But the Act of 1842 removes all doubt or difficulty upon this point. A judgment of dissolution was to be pronounced for all purposes whatsoever, saving and excepting as to the power of the bank, in its corporate name,

to collect and pay its debts, &c. which power is to be exercised by a receiver, *to be appointed by the Governor*, upon being notified by the presiding Judge that the charter has been judicially annulled.

And was not just such a judgment rendered? One which recalled to the State all the liberties, franchises and privileges which had been granted to the bank, and leaving the debts due to and from it untouched? The *form* of the judgment was not prescribed by the Act, and it never was contemplated that it should, in so many words, save and except the liabilities of the Bank from its operation. Hence, it makes no attempt to do this. It would have been a work of supererogation. This had been expressly and effectually done by the several Statutes passed for this purpose. The judgment fulfilled its mission in dissolving the charter. The custody and collection of the debts were committed to a receiver not appointed by the Court, but by the Governor, not deriving his authority from the judgment of the Court, but from the Statute.

We respectfully submit, then, that an attempt is made to wrest this judgment from its legal import, and to attribute to it a meaning and effect never contemplated. Were it otherwise, it was not in the power of the Court to award a valid judgment in contravention of the law. A judgment of a Justice of the Peace for fifty dollars, under the old law, or one hundred under the new, would be void for want of jurisdiction; for where a judgment is beyond the jurisdiction of the Court rendering it, it may be treated as a nullity in a collateral proceeding.

But suppose I am wrong in all this, could there be any doubt, that under the Acts set forth, the judgment might be set aside and a new judgment awarded in conformity with the law? I insist, however, there is no occasion for this. The judgment is right, and it is doing violence to the obvious design of the Legislature and the Court, to undertake to pervert it to the purpose claimed for it.

Suppose just such a judgment was now rendered upon a

*quo warranto*, since the repeal Act of the last Session was passed—would it be pretended that the corporate debts were extinguished? And why not? Why were not the Acts of 1840 and 1842, as much the law, as to this corporation, as the Act of 1855–'56, is now to corporations generally? The late Statute simply repeals the Common Law rule as to defunct corporations. Was it not set aside by the Acts of 1840–'42, as to this bank? Why, then, should a general judgment of forfeiture, without any saving as to the debts, operate differently in the two cases?

I must think that examination and reflection will eventually conduct us to but one conclusion in this case. That such was the cotemporaneous construction put upon the judgment of forfeiture, is evident from this fact. Suits *at Law*, under the Statute, were brought against Judge Alexander, as assignee of the bank, by the bill-holders. He was a gentleman of high professional standing; and yet, he submitted to have judgments go against him, without opposition. And these judgments are made the foundation of the suits, at this day, against the stockholders; and it will not do to say, by way of explanation, that he was sued as assignee under the deed, and not under the law. As assignee under the deed merely, no action at Law could have been brought against him. And no one knew this better than he did.

Before dismissing this branch of the case, I would take occasion to remark, that more than once during the discussion of these bank cases, Counsel have portrayed in vivid colors the hardship of enforcing the individual liability clause against the stockholders, when by the judgment of forfeiture, they were deprived of the means of meeting and discharging the indebtedness of the bank. But by reference to the Acts, it will be seen that no such injustice is ascribable to the Legislature. The provision for collecting the corporate assets was co-extensive with that for paying its debts. And if any debtor of the bank has escaped, upon the ground that his liability was extinguished, the fact has not been brought to the knowledge of this Court. Indeed, it is more than intimated

—it is distinctly stated in this discussion, that the assignee suffered the debts to be lost, because he did not see fit, for reasons satisfactory to himself, to enforce their payment.

[9.] The only remaining question is, as to the constitutionality of the Act of 1843. The objection is, that the body of the Act does not correspond with its title. We are unable to detect the discrepancy.

The Act of 1840 was to compel the several banks to redeem their liabilities in specie; and to provide for the forfeiture of the charters of such as might refuse. The Act of 1841 was to arrest judicial proceedings and grant further time for resumption. The Act of 1842 was simply amendatory of these two; and the Act of 1843 was amendatory of all three—and such only is its title. Where is the repugnancy? Does not the Act effect what its title indicated? Instead of the Legislative assignment and its execution by a receiver, to be appointed by the Governor, as directed by the Act of 1842, the Act of 1843 ratifies the assignment by the Bank and substitutes the assignee therein named, in the place of the receiver, as contemplated by the previous law. Instead of discord, we see nothing but the strictest harmony and conformity between the Act of 1843 and its title.

---

McDonald, J. concurring.

The judgment of the Court below, in this case, is reversed on several of the assignments of error, by the unanimous judgment of the Court. Two of the assignments of error are overruled by the unanimous judgment of this Court, and there is an affirmance of the judgment, by a majority of the Court, on

Robinson *vs.* Lane.

two other assignments—one of the members of the Court dissenting.

The two assignments of error on which the Court disagree, are—

First. In the rejection by the Court of the testimony of M. Robinson, as to the value and amount of the assets turned over to the assignee, and the waste thereof by the assignee.

Second. The refusal of the Court to charge the Jury, that by the judgment of forfeiture, the debts due by the bank were extinguished.

It is not necessary that I should discuss any other matter in the case, than the points on which the Court disagree. I will consider, first, the last of the two above stated assignments.

I have no doubt, that according to the Common Law, on the civil *death* of a corporation, its debts are extinguished, and I have as little doubt that the Legislature has power to prevent that effect. A corporation is factitious; and if the power which creates it, in the act of its creation, or by subsequent constitutional enactment, makes no provision for preserving and continuing the debts due to and from it, on its absolute dissolution, they perish with it—they become extinct.

If the charter of the Planters' & Mechanics' Bank was repealed or annulled, and the corporation was absolutely dissolved thereby, unless they have been prevented by competent constitutional legislation, the consequences ensue to which I have adverted.

The important question in this case then is, was the corporation absolutely dissolved by the judgment pronounced? And if it was, have the debts due to and from it been saved from extinction by the Legislature?

In considering the effect of the judgment, I will inquire—

1st. Into the origin of the proceeding and its objects.

2d. What was the proper judgment under the proceedings instituted?

3d. The nature of the judgment pronounced?

4th. Whether the judgment operates as a forfeiture, without execution of it?

1st. What was the origin and object of the proceeding instituted against the Planters' & Mechanics' Bank of Columbus?

Prior to the meeting of the General Assembly in 1840, some of the banks of this State had suspended specie payments. The Legislature, at the session of that year, made it the duty of the Governor to issue his proclamation, requiring suspended banks to resume specie payments on or before the first day of February thereafter, and on the refusal or failure of any bank to do so, and on due proof thereof, to order judicial proceedings to be instituted forthwith against it to the end that the charter might be declared as forfeited and annulled, and that the assets of the same be immediately placed in the hands of a receiver, for the benefit of the creditors thereof.

The suspension of specie payments by the bank, and its continuance in a state of suspension, were considered such abuses of its franchise as called for the interposition of the Government to protect the people from a worthless currency. The Legislature, however, did not intend to inflict the great evil on the community that would have followed the extinguishment of the debts due to and from the defaulting bank; and therefore, by the strongest kind of implication in the Act of 1840, repealed the Common Law principle adverted to, by providing that on the judgment of forfeiture, the assets should be immediately placed in the hands of a receiver, for the benefit of the creditors.

The General Assembly of 1842, declared its intention still more emphatically, and it may be said, repealed this principle of the Common Law in these cases, by enacting that on the rendition of a verdict on which a judgment of forfeiture should be pronounced, the Judge should pronounce a judgment of dissolution of said corporation for all purposes whatsoever, saving and excepting as to its power, in its corporate name, to collect and pay its debts, and to sell and convey its estate;

real and personal. Hence, it was not only intended, but actually provided by the Legislature, that notwithstanding a judgment of forfeiture should be pronounced, the relation of debtor and creditor between the bank and its debtors and creditors, should not be interrupted; that there should be no reversion of the real estate to its grantor, and that its personal estate should be applied to the payment of its liabilities.

There can be no question of the validity of these Statutes. The Legislature had the constitutional power to pass them. It had control over the subject. Indeed, proceedings for dissolving a corporation or seizing its franchises, must be instituted by authority of the State. (5 *Mass. Rep.* 230.) A corporation may be dissolved for some purposes; that is, in part, and in such cases, in England, it may be renovated by a new grant from the King. (*The King vs. Passmore*, 3 *Term. Rep.* 241.)

The proceeding had its origin with the Legislature, and its object was, to deprive the bank of its franchise; and while it did that, to protect the community against the effects of a total dissolution, under the rules of the Common Law, upon its debts.

What was the proper judgment, then, on a verdict against the bank, on proceedings instituted under the foregoing authority?

The proceeding adopted by the State's officer against the bank, was just such as was best calculated to carry into effect the legislative intent. An information in the nature of a *quo warranto*, was filed against it. What is the proper judgment on such a proceeding?

A *quo warranto* is the remedy where there is a body corporate *de facto*, who take upon themselves to act as a body corporate, but from some defect in their constitution, they cannot legally exercise the powers they affect to use. (3 *Durn. & East*, 244.) Prosecution by *information*, in the nature of a writ of *quo warranto*, is substituted for the tedious and protracted proceeding by *writ* of *quo warranto*.

The process is speedier, and the judgment not quite so decisive. It is applied to the mere purpose of trying the civil right, *seizing the franchise* or *ousting the wrongful possessor.* (3 *Bl. Com.* 263.) The judgment is, that the parties be ousted, and the franchises seized into the hands of the Government. (2 *Kent,* 313.) If the party has continued in possession of the liberty by wrong, the judgment is, that he shall be ousted; but if he once had title and loses it; the judgment is, that the liberty shall be seized. (*Yelverton's Rep.* 192.) The judgment in the *case of the City of London,* was a judgment of seizure into the hands of the King, and the corporation was not thereby dissolved, for such judgment neither dissolves nor extinguishes the body politic. (4 *Modern Rep.* 58.)

Mr. *Grant,* in his able treatise on the law of corporations, after an elaborate analysis of the authorites on this subject, states as one of the principles to be deduced therefrom, that for the purpose of punishment, short of annihilation, the proper proceeding where a corporation either abuses its undoubted liberties, franchises, &c. or usurps new liberties, &c. not granted in its charter, is an information, by the Attorney General, in the nature of *quo warranto,* where the judgment for the Crown will be seizure into the hands of the Crown.

This is to be adopted, where the object is punishment by deprivation of corporate rights for a time, not the total and final deprivation of these rights. (*Grant on Law of Cor.* 301.) The judgment rendered in this case, is a judgment of seizure into the hands of the State. It is in conformity to the law in such cases. "Where it appears that the King or his ancestors, have once granted a liberty, and the liberty is forfeited by mis-user or non-user, the judgment shall be, that it be seized into the King's hands." (2 *Kyd on Cor.*) "In cases of abuser or non-user of a franchise, once lawfully granted, the King resumes that which originally flowed from his bounty; and this course, it has been said, is most beneficial to the subject, who, though by forfeiture, mispleading or default, he may lose his liberty, may have *recourse to the*

King's mercy for restitution." (*Ib.*) Where it appears that a liberty is usurped by wrong, exercised on no title, by the King's grant or otherwise, judgment of ouster, only, should be entered. (*Ib.*) The proceeding in this case, was not the proper proceeding to annul the charter. It was a proceeding on which a judgment of seizure alone could be entered. The judgment rendered, was the usual judgment of ouster, including a judgment of seizure. (2 *Kyd on Corp.* 407; 8 *Cowen's Rep.* 721; *Grant on Cor.* 298, *note q.*) The judgment in the case, as rendered, does not destroy the corporation. It is in conformity, also, to the legislative intent, that it should not have that effect.

It will be necessary to say but little on the next ground, as to the nature of the judgment pronounced, having had occasion to say so much on that subject.

It is insisted that the judgment rendered, dissolves the corporation. I have shown that an information in nature of a writ of *quo warranto*, is not the proper proceeding against a corporation to dissolve the charter, and that the judgment therein is a judgment of ouster or seizure.

If the members of a corporation have abused their liberties, as granted in their charter, and it is desired to annul the corporation, the proper proceeding for that purpose is by *scire facias*. (*Grant on Cor.* 301.) The judgment in such case is, that the charter granted to the corporators, that they should have the franchises, privileges, corporate rights, &c. in the charter granted, be revoked, vacated, annulled, and be held vacate, invalid, and taken for wholly null, &c. &c. In such a case, the lands of the corporation, on its dissolution, revert to the donor; debts due to and from it are extinguished, and its personal estate vests in the State or the people. I know of no exception to this except in the case when " a prior grantor brings a *sci. fa.* in the name of the State in respect of something which, having first been granted to him, is subsequently granted, in whole or in part, to another." (*Grant on Cor.* 45.) In this last case, the judgment should

proceed further, and add a clause of seizure into the hands of the State that it may be preserved for the prior grantee.

It is argued, however, in this case, that the judgment dissolves the corporation, and that inasmuch as the Court did not render the judgment, with the exception expressed in the Act of 1842, or rather because the exception expressed in the Act is not incorporated in the judgment, the debts of the bank are extinguished by the judgment—and it is stated to have been the opinion of the Judge who rendered the judgment, that the exception in the Act was unconstitutional: and that therefore, it was purposely omitted in the judgment.

These things do not appear in the record. They are altogether traditional. We must act upon the judgment as it is, and determine its legal effect as it stands in connection with the whole proceeding and the law. It seems to me that if the presiding Judge had considered the Act as prescribing the form of the judgment, he would have conformed to it as far at it was in his opinion constitutional. The Act of 1840 declares that the proceedings should be instituted, to the end that the charter of the bank may be declared as forfeited and annulled. The Act of 1842 declares that the Court "shall pronounce the judgment of the dissolution of the said corporation for all purposes whatsoever." Then follows the exceptions. The judgment pronounced does not declare the charter forfeited and annulled, nor does it adjudge the corporation dissolved for all purposes whatever.

It adjudges, 1st. That the liberties, privileges and franchises, to-wit: that of being a body politic and corporate, by the name and style of the Planters' and Mechanics' Bank of Columbus, heretofore used, enjoyed and exercised by the defendant, be seized into the hands of the State.

2d. That the said defendant (treated as an existing, undissolved body) do not, in any manner hereafter, intermeddle, use, have, enjoy or exercise any of the liberties, privileges or franchises of a body politic or corporate.

3d. That the defendant be absolutely forejudged and ex-

cluded from holding, using or exercising any of the privileges, franchises or liberties of a body corporate or politic.

- I will not pause to inquire whether this judgment affects. the *grantees* of the franchises, &c. It is their grant and contract that were moved against. If it did, it amounts to no more than a judgment of seizure of the liberties, franchises,. &c. into the hands of the State, and that the bank be prohibited from using any of the franchises, &c. conferred on the grantees in the charter, and from intermeddling therewith. But granting that by its terms it affects the rights of the grantees, to what extent does it affect them?

The judgment is on an information in the nature of a *quo warranto.* Mr. *Grant,* in his treatise already referred to, says that the proceeding by *sci. fa.* appears to be the only adverse legal proceeding by which the corporation can be finally annulled, for the effect of a judgment of seizure into the hands of the Crown, of the liberties, franchises, &c. followed by actual seizure, accordingly does not, *of itself,* operate to annihilate the corporation, which may, at any time, be restored and revived by the Crown. (295, 297, *note o,* 301.) What becomes of the assets, debts and liabilities of the corporation upon the seizure? In England, the Crown,. upon seizure of the franchise, appoints a *custos,* who discharges all the functions, duties, &c. of the corporation, until the restitution of the liberties, or revival of the corporation. (*Grant on Cor.* 302.)

But laying aside all the learning on the subject of corporations, their dissolution, &c. to be derived from the authorities, and our Statutes settle the whole matter. If the Common Law had established a rule that, on the civil death of a corporation, its estate, real and personal, and its assets,. should be vested in a *custos* or receiver, to be appointed by the Crown or the Court, who should sell the estate, collect the assets and pay the liabilities of the corporation, the debts, of course, would survive the dissolution. Our Statutes are surely as potent as the Common Law; and if there is any

thing in language, they save the debts of this bank from extinction.

It is scarcely necessary to consider whether the judgment can operate as a forfeiture, without an execution of it. I think it cannot. "After judgment, the regular course is, to issue a writ of seizure to the Sheriff, which, after reciting the proceedings in the *quo warranto*, commands him to seize the liberties into the King's hands." (2 *Kyd on Cor.* 409.) But this writ, says the author, in point of fact, has not always issued. That the writ has not always issued, by no means establishes the law to be, that the forfeiture is complete without it.

If the defendant is in Court when the judgment is rendered against him, to restore the patent into Chancery, no process is necessary, unless he refuses to bring in the patent. It is in such cases, I apprehend, that no execution is issued.

If the patent, which is avoided by the judgment, belongs to a corporation, a *distringas* is the proper process to compel them to bring it in to be cancelled. (*Hindm. on Patents,* 425; *Grant on Cor.* 44, *note S.*)

But how is a judgment to be executed here, where the charter is a public law, all our Statutes being, by express enactment, public Statutes? It cannot be brought into Court to be cancelled. In England, it is said that patents or charters granted by the Crown, by direction of Parliament, cannot be set aside or repealed by the judgment of a Court. A charter granted by Parliament, cannot be repealed or changed but by Act of Parliament. (*Grant on Cor.* 10.) All charters in this State are by Statute, and they are by Statutes irrepealable, at least in the first instance. They are irrepealable because, after acceptance, they become contracts, and the State can pass no law which impairs their obligation. Hence, to adopt the rule above stated, charters, in this State, could never be interfered with by any kind of proceeding. It is not necessary to adjudicate any thing in regard to that matter in this case. I will, nevertheless, say, that a rule might be adopted.

VOL. XIX–46

here to accomplish the object of repeal without interfering with the principles of the Constitution. The only impediment to Legislative repeal, is the constitutional provision to which I have adverted. The Judiciary has no power, by any kind of proceeding, to repeal a Statute, but it has power to rescind a contract on legal principles.

The ground on which charters are forfeited, is that a corporation cannot be allowed to take a grant and repudiate the conditions on which it is made; and therefore, a breach of the conditions, is punished by withdrawing the grant.

A judgment of forfeiture annuls the contract and removes all constitutional difficulties from the subject, and the Legislature may then repeal the charter without encountering the prohibition of the Federal Constitution.

The conclusion to which I have come is, that the Court below was right in refusing to charge the Jury, that by the judgment of forfeiture pronounced in this case, the debts of the bank were extinguished.

The Court committed no error, in my opinion, in rejecting the evidence of M. Robinson in regard to the value and waste of the assets which had been turned over to the assignee.

The Act of the Legislature, by declaring the assignments legal and valid, to all intents and purposes whatsoever, only affirmed the Common Law on that subject. It was legal and valid without the Act. The Statute was not certainly intended to operate beyond its words. It cannot have the effect of fixing the assent of creditors to it, even if that affected the case.

The plaintiff in error is not a surety; he is a principal. It is true his liability is *ultimate;* but by accepting the charter, he assumed that liability as a principal. The bank is owned by the stockholders, and every stockholder assumed the same kind of liability; and if they are sureties, they are sureties for themselves.

But if they are sureties, the creditors are not affected by the waste of the assets by the assignee, who became receiver

by the Act of 1843. That Act was passed after the judgment, on the information against the bank. No receiver had been appointed, and no competent person was found who would accept the appointment. The assignee was converted into a receiver, and was invested with power to sue, and was subjected to suits at the instance of creditors.

It is not pretended that the creditors were parties to the assignment, when it was made; then what was the effect of the assignment as to the creditors? Did.it constitute them *cestui que trusts*, as is contended? "A man who, without any communication with his creditors, puts property into the hands of trustees, for the purpose of paying debts, proposes only a benefit to himself by the payment of his debts; his object is not to benefit his creditor; it would therefore be a result most remote from the contemplation of the debtor, if it should be held that any creditor discovering the transaction, should be able to fasten on the property and invest himself with the character of a *cestui que trust*." (*Bill vs. Cureton*, (2 *Mylne & Keene*, 503.) The ratification of the creditors must be inferred from their own acts, and not from the acts of the debtor.

The Legislature cannot make contracts for individuals, and no assent of creditors to the assignment can be inferred from the Act of 1843. The object of that Act was to convert the assignee into a receiver, and to impose on him the duties and liabilities of that office. It was with him to acquiesce in or reject the responsibilities thus thrown upon him.

As we hear of no complaint from him, it is to be presumed that his conduct has amounted to an acceptance, which he is not now at liberty to withdraw. By that Act he stands in the place of the bank; he is its representative, except as to individual liability for the debts; he is to be sued instead of the bank. Does a suit by a creditor against him, amount to a ratification of the assignment? By the suit the creditors recognize the defendant as the assignee or receiver, but do not adopt the assignment in the sense contended for by defendant.

To obtain the benefit of the ultimate liability of the defendant, it is held that the creditors must show a judgment and execution against the bank or the assignee, who is, as receiver, its representative, with a return of "*nulla bona.*" But it is contended, that by using the only possible means to enforce their rights, they forfeit them. Such a position cannot be supported. The assignee is not the agent of the creditors; he is not subject to their contract; he was made assignee without consultation with them; they have relinquished no right which they had against the bank or stockholders, by suing him; the bank might have been sued by them notwithstanding the assignment; they have neither directly nor indirectly, in consideration of the assignment, released the bank from liability; the bank could not plead in bar the assignment; the creditors cannot be forced, by the debtor, now that we have no bankrupt law, to accept an assignment in satisfaction; this can be done by contract alone, and there is no contract, express or implied, demonstrated by the evidence, which discharges the bank or stockholders from liability, in consequence of the assignment. This is not the case of collaterals, pledged to a creditor for the payment of his debt, and he loses them by negligence. The waste of assets by an executor, given him in trust for the payment of debts, does not relieve a security for a debt, though the creditor may have exhausted all legal and equitable remedies against the executor.

The Court, therefore, in my judgment, very properly rejected the evidence of the amount of assets assigned.

BENNING, J. dissenting.

In this case, a number of decisions were made by this Court. In all of them, except three, I concur. Those three are—First, as to the nature and extent of the liability which the eleventh section of the charter of the Planters' & Mechanics' Bank of Columbus imposes on the stockholders in that bank. Secondly, as to the effect, if any, which the trustee's wasting the property assigned to him by the bank, to be applied to the payment of the debts of the bank, had on the liability imposed by the section aforesaid, on the stockholders in the bank. Thirdly, as to the effect, if any, which the judgment of forfeiture rendered against the bank, had on the said liability imposed on the stockholders.

The reasons for my dissent from the first of these three decisions, have been pretty fully expressed in other cases, which have been before this Court. Referring to what I have said in *Adkins vs. Thornton*, a case argued at the same time with this, I dismiss the point as to the first of the three decisions.

My dissent from the other two of the three decisions, I cannot dispose of so summarily. I must give my reasons for it.

What, then, was the first of those two decisions?

On the 26th of May, 1843, the Planters' & Mechanics' Bank of Columbus, by deed, assigned to Robert B. Alexander, " all and singular the property, goods, effects, debts, dues, claims and all the other personal estate belonging to," said banks, " upon trust;" that he, as soon as he conveniently could, should make sale and dispose of " so much thereof, and such part thereof, as" was, " in its nature saleable, for the best price, in money, that" could " be reasonably had or obtained for the same ;" and that he should " collect and get in so much thereof as" was " not, in its nature, saleable ;" and that he should, in the first place, pay himself his expenses incurred in such sales and collections, as well as pay all other expenses that might be incident to "the execution of

the trust" in the assignment expressed; and then that he should "apply the residue of such trust moneys to the payment and satisfaction of the several sums of money due and owing by said Planters' & Mechanics' Bank of Columbus, to all the creditors of said bank, *pari passu,* and without any preference or priority of payment, other than such as" might "be prescribed by law."

The assignment contained no words of trust, in favor of the stockholders of the bank.

The assignment was made, shortly before the time at which judgment of forfeiture was rendered against the bank.

In the declaration, it is alleged that Adkins, the plaintiff therein, on the 16th of April, 1847, sued "Robert B. Alexander, assignee" of the said bank, upon the same notes on which that declaration against Robinson as stockholder, was founded; and that on the 10th day of Feb'y, 1848, he recovered "of said bank" the amount of the notes.

On the trial, Robinson proposed "to show assets remaining in the hands of Ragan," as succeeding assignee to Alexander; and also, proposed to show the amount of assets turned over to Alexander, under the assignment, in order to make it appear that a sufficiency of assets had been turned over to Alexander, to redeem the liabilities of the bank; and also proposed to show acceptance of the assignment by Adkins. As evidence of such acceptance, Robinson insisted that he had the right to rely on the terms and intent of the Acts passed by the Legislatures of 1842 and 1843, in reference to banks in a state of suspension; and on the fact that Adkins had, as aforesaid, sued Alexander as assignee.

The Court held that Robinson could not establish his point, unless he could show "an actual assent by the creditor—an implied assent not being sufficient." And to that decision, the defendant excepted.

The defendant also offered to prove, that Alexander had "wasted, misapplied and squandered the assets" turned over to him as assignee. This the Court also refused to let him do; but on what ground the refusal was put, the bill of ex-

ceptions does not state.    And to that decision, the defendant excepted.

Were these decisions right?    That is the precise question for my consideration.

The reason which governed the Court in the making of the latter of the two decisions, was probably the same as that which governed it in the making of the former of the two, viz: the notion that nothing short of " actual assent by the creditor," to the assignment, would be sufficient to make him a party to the assignment.

This is a narrow ground for the decision to rest on; and in the argument before this Court, the decision was placed on a broader ground, viz: that a waste of the assets by the assignee would be no defence to the stockholders, even if the bill-holders properly assented to the assignment.    I shall, therefore, have to inquire into the validity of both grounds.

Is it true, then, that the assent of a creditor to the assignment, to be good, had to be "actual"; is it true that "implied assent" by a creditor, would not have been sufficient? I answer no.    If the acceptance of a deed can be implied from facts, the acceptance is as good as it would be. if it were express.    Surely there can be no doubt of this.

And if an acceptance by acts will be sufficient, then, on a question of acceptance or no acceptance, any acts going to show acceptance, will of course be admissible as evidence.

Adkins brought suit on his bills against the assignee. This was an act from which it was certainly possible that the Jury might infer that he accepted the assignment.

So, the Act of 1843 declared the assignment to be valid. The assignment was made for the benefit of the creditors. A Jury might, therefore, conclude that the Act was procured by the creditors.    But if the Act was procured by the creditors, then the Act is evidence that the creditors assented to the assignment.

Hence, I think that the ground on which the Court put its decision, was not a sufficient one.    I proceed to the other ground.

Robinson *vs.* Lane.

If the trustee had wasted the assets, would that have been a defence to the stockholder, Robinson, against the bill-holder, Adkins, to the extent of the wasted assets ?

In treating this question, I shall first endeavor to find what would have been the answer to it if no judgment of forfeiture had ever been rendered against the bank. Secondly, I shall try to find what is the answer to it, considering that a judgment of forfeiture has been rendered against the bank.

Supposing, then, that no judgment of forfeiture had ever been rendered against the bank, would a waste of the assets by the assignee have, to the extent of the wasted assets, constituted a defence to the stockholder, Robinson, against the bill-holder, Adkins ?

Certainly not, if the assignment was itself invalid. And it was argued that the assignment was invalid.

The assignment contained no stipulation for the benefit of the *stockholders* in the bank. Its stipulations were for the benefit of the *creditors* of the bank.

In the Penal Code it is declared that all assignments "made by any bank in contemplation of insolvency, except for the benefit of all the creditors and stockholders, shall, unless made to an innocent purchaser for a valuable consideration, and without knowledge or notice of the condition of said bank, be fraudulent and void." (*Cobb Dig.* 797.)

But soon after the making of the assignment, the Legislature, by Statute, declared that the assignment should "be taken, held and considered valid for all purposes, both in Law and in Equity." (*Act of* 1843, *Cobb Dig.* 121.)

If this Statute was passed with the assent of the creditors and that of the bank, I suppose it will be admitted by all that the Statute was valid.

But the assignment was made for the benefit of the creditors, and the Statute was passed for the benefit of the assignment. It is to be presumed, therefore, at least until the contrary be shown, that the Statute was passed with the assent of the creditors.

So, as the bank made the assignment, it is to be presumed

that the bank wished the assignment to be operative. The object of the Statute was to make the assignment operative. It is to be presumed, therefore, that the Statute was passed with the assent of the bank.

I think, therefore, that notwithstanding the declaration aforesaid, contained in the Penal Code, the assignment was valid.

Assuming the assignment to be valid, what relation to it do the stockholders bear?

The assignment was made to secure the bills and other debts due from the bank.

By the eleventh section of the charter of the bank, it is declared that the stockholders in the bank, shall, according to a stated rule, be liable for the " ultimate redemption" of the bills of the bank. This makes the relation which the stockholders bear to the bills that of *sureties.* No liability that is no more than an ultimate one can be the liability of a principal. And every liability to pay a debt must be either that of a principal or that of a surety. There is no third sort of liability.

And (not to dwell on this point) this Court has repeatedly said that the stockholders under this clause are only sureties for the bills of the bank. (11 *Ga.* 517; 8 *Ga.* 478.)

This, then, is the relation which the stockholders bear to the assignment. They are sureties for the bills, to secure which the assignment was, in part, made.

Assuming, then, the stockholders to be but sureties for the payment of the bills, the question becomes this: Does a trustee's waste of property, assigned to him for the payment of debts, discharge the sureties to the debts, to the extent of the property wasted?

I say it does.

If property which is conveyed to secure the payment of a debt, is conveyed directly to *the creditor himself,* and he wastes it, the surety is discharged to the extent of the value of the property.

This is a proposition which I believe nobody disputes. (*Capel vs. Butler*, 2 *Sim. & Stu.* 462; *Law vs. East India Co.* 4 *Ves.* 824; *Maynew vs. Crickett*, 2 *Swans.* 185; *Theobald on Prin. and Sur.* 143; *Burge on Sur.* 206.)

Indeed, in such a case, not merely is the surety discharged, but the principal also. (*Williams vs. Price*, 1 *Sim. & Stu.* 586; *ex parte Mure*, 2 *Cox*, 65.)

But if the property conveyed to secure the debt be not conveyed directly to the creditor himself, but be conveyed to a trustee for the creditor, and the trustee wastes the property, is the surety to the debt, in that case also, discharged to the extent of the value of the property?

And I say yes. I say that there is no material difference between the two cases; and if there is none, then whatever is law in the one case, must be law in the other.

To show, therefore, that there is no difference between the two cases, will now be my endeavor.

1. In the case in which there is a trustee, the creditor has, in reality, as much *interest* in the property, and as much *power* over it, as the creditor has in the case in which there is no trustee. In the former case, the creditor may compel the trustee to do with the property whatever, in the latter, the creditor can himself do with the property.

In the one case, the creditor has as much agency in the work of making the assignment, as the creditor has in the other. In neither is the assignment made until he accepts it.

In the one case may the creditor disregard the property in the hands of the trustee and compel the surety to pay up the debt; in the other, the creditor may equally disregard the property in his own hands, and compel the surety to pay up the debt.

But if, in these respects, there is no difference between the two cases, then, so far as the *creditor* is concerned, there is no difference between them in any material respect; for these are all the respects that are material.

2. And there is none, so far as the surety is concerned.

Robinson *vs.* Lane.

The surety has not, in the one case, any more *power* over the property, or any more *interest* in it, than the surety has in the other. In the one case, does the surety have, or not have, a resulting trust in such of the property, if any, as may remain after the payment of the debts; in the other, correspondingly, the surety has, or has not, a resulting trust in such of the property, if any, as may remain in that case, after the payment of the debts.

In the one case, has the surety the right to pay up the debts and take the place occupied by the creditor, with respect to the property; in the other, the surety has the same right.

In the one case, the surety has no more agency in procuring the assignment to be made, than in the other, the surety has in procuring the assignment to be made in that case.

In the one case, the surety has no more power to prevent the debtor and the creditor from agreeing upon the assignment, than in the other, the surety has to prevent the debtor and creditors from agreeing upon the assignment.

In each case, the effect of the creditor's accepting the assignment, is equally to destroy the surety's chances for procuring any assignment to himself for his indemnity.

But if, in these respects, there is no difference between the two cases, then there is no difference between them, so far as the surety is concerned, in any material respect; for these are all the respects which are material.

There is, then, no difference between the two cases, either as it regards the creditor, or as it regards the surety; and if so, what is law for the one must be law for the other. But for the one, that in which there is no trustee, what is the law is, that if the property be wasted, the surety is discharged; and therefore, for the other, that must, in like manner, be the law.

And with this, I might rest the point in hand; but as the whole argument of the defendant in error seemed to me to be placed on the assumption, that the stockholders would, under the assignment, have a resulting trust in such of the assigned

;property as might remain after the payment of the debts out ,.of the property, if any of it should then remain, it will be not ..amiss that I give some further notice to that aspect of the case.

I maintain, then, first, that in neither the case in which there is no trustee, nor in that in which there is a trustee, does or *can* any trust in the possible balance of the assigned property result to the surety. Secondly, that if such a trust did or could result to the surety, that would not be sufficient to make him answerable to the creditor for a waste of the property by the assignee.

'1. Does or can a trust in such possible balance, result to the surety? I say it is most manifest that it cannot. The trust in such possible balance, must result to the *principal*— the person from whom such balance with the rest of the property, came. As soon as the debt is paid, the property remaining, if any, becomes freed of all claim on it by the creditor, and it, as a matter of course, goes back to the principal debtor—the person who assigned it—the person to whom it belongs. The surety, by that time, will have been set free; and so, he will have lost every vestige of a claim of any sort, as well against the principal or against the principal's property.

Suppose the bank had escaped forfeiture, and had paid up the debts, to secure which it made the assignment, would not the assigned property have gone back to the *bank?* Would it have gone to the stockholders? Who will say so? The assignment, it is to be remembered, contained no stipulation for the benefit of stockholders. (*Hill on Trustees,* 354, 389, 118.)

But if it were true that in both of the cases, that in which there is a trustee, and that in which there is none, a trust in the possible balance of the property would result to the surety, that would be no reason why the surety would not, in the cases respectively, be discharged on a waste of the property assigned.

For it is, I believe, a general principle, that if property which is held in trust for the payment of debts, is wasted by

the trustee, the loss, if the trustee cannot repair it, falls on the *creditor*. It never falls on one who has no more interest in the property than the right, by implication of law, to such part of the property as may remain, if possibly any part shall remain, after the debts shall have been paid out of the property.

If land is, by will, conveyed to trustees, for the payment of debts, and they raise from the rents money enough to pay the debts, the land becomes discharged of the debts, and the heir takes it unincumbered, although the trustees may have converted the money to their own use, instead of applying it to the payment of the debts. (1 *Salk.* 153; 1 *Peere-Williams*, 518.)

Yet, in such a case, a trust in the remainder of the property, if any, would result to the heir.

So, when property is conveyed to a trustee, that he may sell it and raise money for the payment of debts, the purchaser is not, in general, bound to see to the application of the purchase money. If the trustee misapplies or wastes the money, the loss falls, not on the purchaser, but on the creditor. And yet, in such a case, the purchaser, if the property were re-sold for the payment of the bills, and any of it should remain after their payment, would have a resulting trust in that remainder.

So, as we have seen, if property be conveyed by a debtor *directly* to his creditor, to secure the payment of a debt, and the creditor wastes the property, the debtor is discharged. And yet, in such a case, the debtor would have a resulting trust in any of the property that might remain, after the payment of the debt.

Am I not, therefore, entitled to say, that in neither of the two cases is there or can there be any resulting trust in the surety, and that if there was or could be, that would not render the surety liable for a waste of the assigned property? I think I am.

If so, the argument founded on the assumption that there is such a resulting trust in the surety is doubly worthless.

My conclusion then is, that in the case in which there is a trustee, waste as much discharges the surety as it does in the case in which there is no trustee; and that, as in the latter case, the surety is, beyond question, discharged, so, in the former, the surety must also be discharged.

It follows, if I am right, that as the stockholders were but sureties, a waste of the assigned property by the assignee, was a discharge of them to the extent of the wasted property.

This, then, is the conclusion to which I come, considering the case as unaffected by the judgment of forfeiture; that is, considering the case as standing upon the assignment, and the law contemporary with the assignment.

But as a judgment of forfeiture was rendered against the bank, it becomes necessary to inquire what effect that judgment has on the question:

1. One effect of the judgment of forfeiture was, in my opinion, to extinguish all the debts due to and from the bank. My reasons for this opinion I shall give when I come to treat of the point with respect to the judgment of forfeiture. If I am right in this opinion, it follows that the effect of the judgment was, to discharge the stockholders from any liability they might be under to pay the bills of the bank.

2. But granting, for the present, that extinguishment of the debts of the bank, was not one of the effects of the judgment of forfeiture, an undoubted effect of that judgment was, to bring into operation the Act of 1842, respecting banks in a state of suspension, and to induce the Legislature to pass the Act of 1843, amendatory of the Act of 1842. (*Cobb's Dig.* 118, 120.)

Did the coming into operation of these two Acts affect the conclusions just stated, derived from the law existing previously to the time when those Acts came into operation?

I say no.

The first of the two Acts was, by its terms and nature, not to go into effect until after there should be a judgment of forfeiture. The assignment was not made until after there

was the judgment of forfeiture.   The Act, therefore, could not take effect until after the making of the assignment. The second Act was not passed until after the making of the assignment.   Neither Act, therefore, had any operation until after the making of the assignment.

Now it is to be presumed that the Legislature does not intend its Acts to have a retroactive operation, unless a contrary intention is expressed, or appears by necessary implication.

With respect to the Act of 1842, an intention that it should have a retroactive operation on the assignment, is not expressed in it, nor is any thing expressed in it from which such an intention could be implied.   How could it be, as the Act was passed before the assignment was made, or, as far as appears, was in contemplation.

And as to the Act of 1843, the same thing is true.   The object, at least a great object, of that Act was, to set up and make effectual the assignment.   The first section of the Act declares, that this assignment and two other similar ones, shall be " valid for all purposes, both in Law and Equity."   This is the sole office of the section.   The office of the second section is to declare, " that the assignees shall have power and authority to proceed forthwith to the settlement, collection and payment of the debts due to and from said banking institutions, according to the provisions of the said several deeds of assignment."

If it was the intention of the Legislature to make valid the assignment, it of course could not have been its intention to affect the rights and risks created by the assignment.

I say, therefore, that neither of these Acts touched the rights and risks created by the assignment.   But if either or both did, then I suppose it will be contended by none that the effect was more than this : to give to. the *stockholders* a resulting trust in such of the assigned property as should remain, if any should remain, after the payment of the debts, i. c. to put the stockholders with respect to this possible, balance, in the place of the bank itself.

But an effect of this sort would not be sufficient to render the stockholders liable to the creditors (the bill-holders) to answer for a waste of the assigned property, committed by the assignee.

That one may have a mere resulting trust in the possible balance of property which has been assigned for the payment of debts, whether assigned to the creditors directly or to a trustee for the creditors, does not render him liable to the creditors to make good such of the property, if any, as may have been wasted. The loss, in such case, falls upon the creditors. This we have seen.

The rendition of the judgment of forfeiture with the change of the law consequent upon it, have, then, no effect upon the conclusion to which we came, from the old law. That conclusion was, that when a debtor assigns to a trustee property for the payment of his debts, and the trustee wastes the property, the debtor's sureties are not liable to the creditors to make good the loss.

The stockholders, we have seen, were but sureties for the bank—the debtor. Therefore they are not liable to the creditors, the bill-holders, to repair any loss occasioned by the assignee's waste of the property.

I come, then, to the third and last of the points on which I dissent, and that point is as to the effect which the judgment of forfeiture, rendered against the bank, had on the liability the stockholders were under for the ultimate redemption of the bills of the bank.

The Court was requested by the plaintiff in error to charge the Jury as follows: "That if the Jury shall believe, from the evidence, that the charter of the P. & M. Bank of Columbus was, on the 13th day of June, 1843, absolutely and unconditionally forfeited, without reservation of the rights of plaintiff, and without retaining and continuing the liabilities upon the defendant, then all the debts due to and from said bank became extinguished; and if they shall further believe, that the bills sued on by the plaintiff are debts due from said bank on the day and time of said absolute forfeiture, then said

Robinson *vs.* Lane.

debts were extinguished, and the defendant cannot be made liable for an extinguished debt."

The Court refused to charge this, and the plaintiff in error excepted to the refusal.

In this refusal was the Court right? That is the question.

A majority of this Court answer yes. I answer no; and I will now state why I do so.

The rule of the Common Law that defines the consequences of the dissolution of a corporation, is as follows: " At Common Law, upon the civil death of a corporation, all its real estate, remaining unsold, reverts to the grantor and his heirs; for the reversion, in such an event, is a condition annexed by the law, inasmuch as the cause of the grant has failed. The personal estate, in England, vests in the King; and in our own country, in the people or State, as succeeding to this right and prerogative of the Crown. The debts due and from it, are totally extinguished." (*Ang. & Ames Cor.* 667.)

That this is the Common Law rule that defines the consequences of the dissolution of a corporation, nobody, as far as I know, disputes; that it is that rule, both of my associates, I believe, admit; that it is that rule, every author, or Judge, or Court, that has attempted to state what the rule is, has, as far as I know or believe, declared.

Therefore, that this is the Common Law rule, I assume with confidence.

If this be the rule, it is clear that the debt due to the defendant in error, from the bank, was extinguished by the judgment of forfeiture rendered against the bank, unless there is something to take the debt out of the operation of the rule.

Is there anything to do that?

In the opinion of Judges LUMPKIN and McDONALD, there is.

Judge McDONALD thinks, that inasmuch as the judgment of forfeiture was not executed by an *execution* of some sort, the judgment did not have the effect to dissolve the corpora-

tion. If, in his opinion, the judgment had had that effect,. he, as I understand him, would say with me, that this debt. fell within the rule, and was extinguished.

The sole question, then, between him and me is, whether the judgment of forfeiture, of itself, dissovled the corporation, or whether an execution had to be issued on that judg-- ment, and had to be executed, before the judgment could! produce that effect.

The judgment is not set out in the record. It is to be in-- ferred, however, from the terms of the request to charge, that the judgment was one which declared the charter of the corporation to be " absolutely and unconditionally forfeited,. without reservation of the rights of plaintiff, and without re- taining and continuing the liabilities upon the defendant.'" I suppose the judgment was, in substance, this: that the· liberties, privileges and franchises of the bank, to-wit: those of being a body politic and corporate, be seized into the· hands of the State, and that the bank do not, in any manner,. intermeddle, have, use, enjoy or exercise, any of the liber-- ties, franchises or privileges of a body politic or corporate,. but that the bank be absolutely forejudged and excluded from holding, using or exercising any of the privileges, franchises: or liberties of a body politic or corporate. (See 11 *Ga. R.* 463.)

If this was the judgment, then I say that the judgment is· such as executes itself, or must go unexecuted. It certainly is a judgment which it is simply *impossible* for any Sheriff to· execute, let the command to him, in respect to it, be what it may. It is not a possible thing for a Sheriff to seize a liberty, a privilege, a franchise, or to prevent a corporation from using a liberty, a privilege or a franchise, or absolutely to· forejudge and exclude a corporation from holding or using a liberty, a privilege or a franchise. It is no more possible· for a Sheriff to do such a thing, than it is for him to capture an idea. And *lex non cogit ad impossibilia.*

But the judgment is such as executes itself. This must be so from the nature and the terms of the judgment. And it

is so according to authority. In the *King vs. Amory*, there was not only no execution, but there was no *final* judgment of ouster. The only judgment was one, that the liberties, &c. should be seized into the hands of the King *until the Court should further order.* And yet; the King's Bench held, that this judgment dissolved the corporation. (2 *D. §. E.* 519, 565; *and see* 2 *Just.* 282.)

But if this judgment is such as executes itself, then it, in terms, dissolves the corporation; for it says, (assuming that I am right as to its terms,) that the liberties, privileges and franchises of the bank, *to-wit: those of being a body politic and corporate,* be seized into the hands of the State.

It is true, that in *Nevitt vs. Bank of Port Gibson,* this language is used: "It is the better doctrine, that it is not the mere judgment of ouster or of forfeiture, which works dissolution, any more than sentence of death executes a criminal. There must be execution executed." (6 *Smedes & Mars.* 568.)

But for this position, no Common Law authority is referred to. Nothing is referred to except some very late decisions in State Courts, and *Angell & Ames on Corporations.* And what is said in this latter work, is said with an "it seems," and is made to rest on one of these very decisions. (*Ang. & Ames Cor.* 644.) What the decisions, themselves, rest on, is not stated. I feel sure that they cannot rest on the *King vs. Amory,* or any Common Law authority. And if that be so, they cannot count as of any value in this State.

Besides, one out of the three Judges of the Court which made the decision in *Nevitt vs. Bank of Port Gibson,* dissented from the decision.

I cannot agree, therefore, that according to the law of *Georgia,* "It is the better doctrine, that it is not the mere judgment of ouster, &c. which works dissolution," &c. but that "There must be execution executed." I think that such a judgment as that judgment is, which was rendered against this bank, if that judgment was such as I have supposed it to be, has, of itself, the effect, by the Common Law, to dissolve

a corporation. And the Common Law is the law of this State on the question.

So much for my dissent from Judge McDONALD.

Judge LUMPKIN, if I understand his views, as disclosed in this case, and in the similar case of *Moultrie et al. vs. Smiley and Neal*, (16 *Ga.*) thinks that this case is not within the rule aforesaid, that defines the consequences of the dissolution of a corporation ; and he thinks so because, in his opinion, the case is not within what he considers to be the *reason of the rule.*

In 16 *Ga.* 294, he says, "I deem it advisable to examine, at the outset, into the origin of this Common Law rule, not for the purpose of questioning its legality, but in order to restrict it in its application to the reason in which it is founded. For, *cessante ratione legis cessat ipsa lex.* And I feel fully warranted in this course, inasmuch as the rule has been justly characterized, by the most enlightened tribunals, as odious and iniquitous." Again, he says, "I propose to consider now the true meaning of the word *extinguished,* when used in this connection."

"I am not ignorant of its etymological definition. Lord *Coke,* the "Hercules of the law" who has written so much, has furnished this also : "Extinct" he says "cometh of the verb *extinguere,* to destroy or cut off." (*Coke Litt.* 1 *Vol. by Thomas,* 464.) But the proper inquiry is, what is the *legal* signification, when applied to the debts to and from a defunct corporation?"

"I have said elsewhere, that the only idea intended to be conveyed was, that the debts were uncollectable for want of proper parties to sue and be sued."

In the opinion of Judge LUMPKIN, then, the reason of the rule is, the "want of proper parties to sue and be sued."

And to prove that this is the reason of the rule, his argument, if I do not misunderstand it is, 1. That certain Judges have declared this to be the reason of the rule. 2. That there are certain other cases in which, also, the debt is said to be extinguished, when it is not really extinguished, and that

in those cases the reason why this is said is, that in them there is nobody to sue or be sued. 3. That it is the duty of Courts " to struggle hard to get away from this rule as it stands, because, as it stands, it is a bad rule, and to hold the want of somebody to sue and be sued to be the reason of the rule, will enable them to get away from the rule as it stands."

The sole question, then, between Judge LUMPKIN and myself is, whether the want of somebody to sue and be sued, is the reason of the rule? We agree as to what the rule is. We differ as to what the reason of the rule is. If I could show that the want of somebody to sue and be sued, was not the reason of the rule, he, I dare say, would agree with me that the debt in this case was extinguished by the rule. That that is not the reason I shall now attempt to show. I shall attempt to show that and somewhat more.

I shall attempt to show—

1. That the want of somebody to sue and be sued, is not the reason of the rule.

2. That, at least, if that be the reason of the rule, the argument aforesaid does not prove it to be the reason.

3. That the maxim, the reason ceasing the rule ceases, has place only when what is the reason is certain beyond a reasonable doubt, and that, at least, it is not certain beyond a reasonable doubt that this is the reason of this rule.

4. That if for any reason the debt in this case stands extinguished or suspended as against the bank, it equally stands extinguished or suspended as against the stockholder, because the stockholders are only the sureties of the bank.

5. That there exists no cause to take this case out of the rule.

6. That therefore, the case is within the rule; and consequently, that the debt is extinguished.

1. First, then, is the want of somebody to sue and be sued, the reason of the rule? I answer no; and in support of that answer, I beg, in the first place, to refer to what I have said on the question in my dissenting opinion in *Moultrie et al. vs. Smiley & Neal,* (16 *Ga. R.* 345.)

But in making this reference, it is proper that I acknowledge an error into which I fell in that opinion, in respect to one of the cases which I cited, that of *Edmonds vs. Brown and Tillard.* For this case I had to rely wholly on *Viner's Abridgment;* and judging from what is reported of it in that Abridgment, I inferred that the decision in it was made in the absence of the plea of *non est factum;* and my use of the case rested chiefly on that inference. Having, since writing out that opinion, procured the work in which the case was originally reported, (1 *Levinz*, 237,) I find that I was mistaken. The plea of *non est factum* was pleaded in the case. And it does not positively appear whether the decision in the case was what it was, in consequence of that plea, or in consequence of the dissolution of the corporation. But judging from the side note of the Reporter, *Levinz*, from the statement of the case in *Viner*, from the use made of the case by *Blackstone* and other elementary writers, (1 *Black. Com.* 484,) and especially, judging from the fact, that the case resulted, not in a verdict for the defendant on the plea, but in a non-suit of the plaintiff, we may, I think, pretty safely conclude that the decision was what it was, not in consequence of the plea, but solely in consequence of the dissolution of the corporation.

I proceed to state some views which are not presented in the dissenting opinion to which I have referred, or at least are not distinctly presented.

The rule in question is only one *part* of a rule; it is one part of the more general rule, which defines *all* the consequences of the dissolution of a corporation. And if we make the want of somebody to sue and be sued, the reason of the rule, and bend the rule to that as the reason of it, we put the rule in discord with the whole of the other part of the general rule, that other part being by far the greater part. We make the general rule stand thus: on the dissolution of a corporation, all its lands revert to those from whom they come—all its goods escheat—all the debts due *to* it, in effect, escheat too; or, if not, become extinct; *all the debts due*

*from it, except those on which there are indorsers, sureties or other bound parties, become extinct ; all the debts due from it on which there are indorsers, sureties or other bound parties, become extinct, as against the corporation, the principal, but as against the indorsers, the sureties or the other bound parties, remain in full life.* It is only in reference to such parties, on one side, and the creditors of the corporation on the other, that we can say there is somebody to be sued—somebody to sue.

Making the general rule this what do we do? In one breath we say debts, as against the principal, and all the principal's property, shall be extinguished; in the next, we say the debts, as against the sureties, and all the sureties' property, shall remain in full force.

Now, I ask, is it supposable that any law-maker, of any age, would ever put these two things into one rule? Is it supposable that any law-maker, who would say the first of these two things, could ever bring himself to say the second?

And then, we make no improvement in the rule. We merely shift a loss from one innocent party to another.

As the rule stands, unmodified by this notion that somebody to sue and be sued is the reason of it, the effect of it is to make the creditors of the corporation lose their debts. This is an evil.

As the rule would stand if modified by that notion, the effect would be to make the sureties and indorsers, if any, pay the debts; and yet, deprive them of all chance of being indemnified by their principal or their principal's property, no matter how much property that principal might have. This, too, would be an evil.

And in the abstract, the loss—the hardship, is *precisely* as great if a surety has to lose the debt, as it is if the creditor has to lose the debt.

We must remember that the rule, if thus modified, would reach, not only the stockholders in a bank, but also the indorsers for the bank, the ordinary sureties of the bank, the guarantors of the bank, the parties of every sort, joined with

·the bank. And we have seen that the stockholders in this, bank are but sureties for the bank.

To say that the want of somebody to sue and be sued, was the only reason the law-maker had for declaring, that on the· dissolution of a corporation, the debts due from it should be extinguished, is to impute to him a poverty of invention, which, judging from what he has done in other cases, we, I think, are not at liberty to impute to him.

When a debtor that is a natural person dies, or when he removes out of the jurisdiction, or when there is a trust and no trustee, the case presented is not unlike that which is presented when a corporation is dissolved. It is certainly a case in which there exists no person to sue or be sued. Yet, did the law-maker say that it was a case in which the debt or the trust had to become extinct? Far from it. He treated the debt and the trust as still subsisting as much as ever, and he invented easy modes for enforcing the debt or the trust. Indeed,. the modes are such as must have suggested themselves to the commonest mind—administration—attachment—judicial substitution. Now are we at liberty to say of such a law-maker, that when he declared the debts of a dissolved corporation to be extinguished, he did so, not because he wished them to be extinguished, but because he had not the wit to invent a mode to prevent them from being extinguished?

At least, we cannot impute such a want of inventiveness; to our own law-maker. The Legislature, at its last Session, having the will to prevent the debts of a dissolved corporation from being extinguished, said that they should not be extinguished, and it had the capacity to provide a mode for· rendering that will effectual. The Legislature said, that whenever " any corporation shall be dissolved, the real estate belonging to such dissolved corporation, shall not revert to the grantor, nor its personal estate escheat, nor the debts due to and by such corporation, at the time of its dissolution, be· extinguished; but the said property, both real and personal,. and the said debts due to such corporation, shall remain as if· no such dissolution had taken place and become a trust fund,

first, for the payment of the debts due by such corporation,, and next for distribution amongst the stockholders thereof."

And I ask, in passing, in what sense does the Legislature here use the word "extinguished"—in the sense of *suspended?* Certainly not, but in the sense of *annihilated.* And it so uses the word in that sense, as plainly to show that *it, the Legislature,* considered the word to have that sense in the old Common Law rule.

What, then, is the reason of this rule? This rule is but a part of a general rule, that defines all the consequences of the dissolution of a corporation, and it is the last part. The former part of that rule having said that the lands of the corporation should revert; that the goods should escheat; that the debts due to it should become extinct, or in effect, escheat too, what better could the latter part say of the debts due from the corporation than that they should become extinct? Nothing, it seems to me. I think, then, that the former part of the rule, is the reason for the latter part. This is my conjecture. (See my opinion, 16 *Ga. R.* 355.)

I insist, then, that the want of somebody to sue and be sued, is not the reason of the rule.

2. If, however, that be the reason, I maintain that the argument which I am trying to answer, does not prove it to be the reason.

That argument, if I understand it, is as beforesaid, as follows:

1. Certain *Judges* have declared that the want of somebody to sue and be sued, is the reason of the rule. (16 *Ga. R.* 300.)

2. If a person appoints his debtor his executor—if a woman marries her debtor—if a lunatic's debtor is appointed the lunatic's committee, the debt in each of these cases, respectively, the law says, is extinguished; and yet, the debt is not extinguished, but is only suspended. For, the reason which the law has in these cases for saying that the debt is extin-

guished is, that in them there exists nobody to sue and be sued.

Therefore, concludes the argument, in like manner, when, in the case of a dissolved ·corporation, the law says that the debts are extinguished, the debts are not really extinguished, but are only suspended; and the reason which the law has for saying that they are extinguished, is merely that there is nobody to sue and be sued. (*Id.* 300 304.)

3. It is the duty of Courts " to struggle hard to get away from" the word extinguished, used in this rule, because that word, if taken in its ordinary sense, would make the rule a bad rule; and if they will hold the want of somebody to sue and be sued to be the reason of the rule, they will enable themselves to get away from the word. (*Id.* 333.)

I address myself, first, to the second head of this argument, as much of what I have to say upon that head, will be, in some degree, applicable to the first head.

I make one general objection to the argument under this second head—an objection equally applicable to it in each of its three branches. The argument is an argument from analogy—a kind of argument too frequently fallacious, when analogy really exists. My objection is, that here analogy does not really exist.

When a corporation is dissolved, its lands revert, its goods escheat, its choses in action either become extinct, or, if not, they, too, in effect, escheat, as if they are collected the money escheats.

But when a debtor becomes the executor of his creditor—when a debtor becomes the husband of his creditor—when the debtor of a lunatic becomes the committee of the lunatic—none of these things, or the like of these, happens to the debtor.

And it seems to me, as I have said, that in these things, the law *might* see as good a reason for saying the debts of a corporation shall be extinguished, as it could see in the fact, that on the dissolution of the corporation, there is nobody to sue or be sued.

Robinson *vs.* Lane.

Now, with such a want of analogy, what is the argument from analogy worth? Surely very little.

Admitting, however, for argument's sake, that there is somewhat of analogy between the cases respectively, then I meet the argument with the following propositions:

1. I deny the law of the cases argued from, to be such as the argument takes it to be.

2. I maintain that law to be, in some respects, the opposite of what the argument assumes it to be; in others, quite different from what it assumes it to be.

3. Whether, however, the law be such as the argument takes it to be, or such as I take it to be, it is at least such that it puts the debt into a state of extinguishment or of suspension, as against the *debtor* himself. And I maintain that this same law, which thus does this, as to the debtor himself, equally does it as to the debtor's indorsers, sureties and co-debtors of every sort. Hence, I say that if these cases prove the debt to be only in a state of suspension, as against the corporation, they equally prove it to be in a state of suspension as against the indorsers, the sureties and the co-debtors of the corporation, into some one of which classes the stockholders fall.

4. I conclude, that if any inference is to be drawn from the cases to the case in hand, it is the opposite of that which is drawn in the argument aforesaid.

1. I proceed, now, to establish these propositions if I can; and first, I will try to establish them with reference to the case in which a debtor is made the executor of his creditor.

As to this case, the proposition I am to meet is, that when a debtor becomes the executor of his creditor, the law says that the debt is extinguished; and yet, that the debt is not extinguished, but is only suspended; and that it is, thus, only suspended instead of being extinguished, because the law's reason for saying that it is extinguished, is merely the non-existence of anybody to sue or be sued for the debt, a man not being able to sue himself. I cannot admit this proposition.

I maintain, that in every instance under this head, in which

the law really *says* that the debt is extinguished, it is extinguished. I grant, however, that there are instances under it in which the law does not say that the debt is extinguished; but in these, I insist that the debt is not even suspended. These are the instances in which the assets, *exclusive* of the debt owed by the debtor-executor, are not sufficient to pay the testator's debts. In these instances the law does not say that the debt is extinguished. On the contrary, it says that in them the debt shall be assets. In *Wms. on Ex'rs*, (814,) is to be found this passage : " It must, however, be observed, that as between the debtor-executor and the creditors of the testator, this doctrine" (the doctrine of extinguishment) " is applicable only in cases where there are assets sufficient to satisfy the testator's debts. For it would be unfair to defraud the creditors of their just debts, by a release which is absolutely voluntary. And therefore, the debt due from the executor shall be considered, on their behalf, as assets in his hands." And this is well sustained by the authorities cited to support it. And see *Flud vs. Rumcey,* (*Yelverton,* 160 ; *Coke Lit.* 264, *b. Note* 1.)

But in the instances in which the assets are sufficient to pay the debts, (and legacies ?) the law *does say* that the debt due by the executor is extinguished, and it means what it says. The debt, in those instances *is* extinguished. This is well established . ( *Wms. Ex'rs*, 811, 814, *and citations.*)

And I say, too, that in those instances in which the law says that the debt is extinguished, the want of somebody to sue and be sued cannot, I think, be the reason why it says so.

For first. So far as the executor himself is concerned, he has no need of any suit to enable him to collect the debt. He sustains, in his own person, the character of both debtor and creditor. He may, therefore, of his own mere will, pay himself whatever, as debtor, he owes himself as creditor.

Secondly. So far as claimants upon him, in respect to the debt legatees or others are concerned, they may sue him for an account of that debt, as easily as they can sue him for an account of *any* of the assets—as easily as *creditors* of the tes-

tator can sue him for an account of the debt, in those instances in which such creditors are entitled to make him account for the debt.

Thirdly. The want of somebody to sue or be sued, if it exists in the case of a debtor made executor of his creditor, equally exists in the case of a *creditor* made executor of his debtor; or of a debtor made *administrator* of his creditor; or of a creditor made *administrator* of his debtor. And yet, in neither of these cases does the law say that the debt is extinguished. (*Wms. Ex'rs.* 815, 817.) True, perhaps, that in the case of the *creditor* made executor or administrator, if assets, to the amount of the debt, come to his hands, the debt may, on the principle of retainer, be considered as extinguished; i. e. as, in effect, *paid by the debtor.*

Fourthly. There is no want of somebody to sue and be sued, in the case in which the debt of the debtor made executor of his creditor, is joint and several, or in that in which it is indorsed; and yet, in these cases, whenever the law says that the debt is extinguished as against the debtor-executor, the debt is equally extinguished against the co-debtor or the indorser. (*Infra.*)

Fifthly. Another thing than the want of somebody to sue and be sued is, I maintain, in the case of the debtor-executor, the reason why the debt is said, by the law, to be extinguished, in the instances in which it is said to be extinguished, as well as the reason why the debt is said, by the law, not to be extinguished, in those instances in which it is said not to be extinguished. Where a creditor appoints his debtor his executor, the law presumes that his intention is to *release* the debt. (*Wankford vs. Wankford. Salk.* 299; *Yelv.* 160; 8 *Coke*, 136.) This intention is a lawful one, if the debt is not needed as assets for the payment of the testator's debts; if it is needed for that purpose, the intention is not a lawful one. Therefore, in the former case, the law ought to say that the debt is extinguished, whilst in the latter, it ought to say that the debt is not extinguished. *This,* I think, is the reason of the rule.

Sixthly. But whether, in this case of the debtor-executor, the law, when it says that the debt is extinguished, means that it is extinguished, or means only that it is suspended; and whether the reason which the law has for saying this, is the want of somebody to be sued, or is some other reason, one thing I feel confident is certain, and that is, that as long as the debt remains in the condition, whether of extinguishment or of suspension, as to the debtor, it remains in that same condition, as to the debtor's sureties and indorsers. "Thus, if several obligors be bound jointly, and the obligee constitute one of them his executor, it is an extinguishment of the debt at law, and a release to them all. So, if an obligee in a joint and several bond, makes one of two obligors his executor, the action is discharged as to both obligors; for a release to one of several obligors, whether they be bound jointly or jointly and severally, discharges the others, and may be pleaded by all. ( *Wms. Ex'rs*, 812.)

Now if these things are so, it is quite manifest, I think, that with respect to the case of the debtor-executor, my first three propositions are true. But if those three are true of that case, the fourth must also be true of it, for it is but a plain conclusion from them. It is, that if any inference is to be drawn from the cases, (including this case of the debtor-executor,) that inference is the opposite of the one which is drawn from them in the argument which I am trying to answer.

2. I proceed to the next of the three cases on which this head of the argument I am trying to answer is made to rest, and that is the case of the debtor who marries his creditor. And as to this case, I feel sure that we may say of it most of what has been said of the case of the debtor-executor.

According to Lord *Coke*, the marriage in such a case amounts to a *release* of the debt. "If the *feme* obligee take the obligor to husband, this is a release, in law. The like law is, if there be two *femes* obligees, and the one take the debtor to husband." (2 *Coke Litt.* 264, *b*.) And in *Viner's Abridgment* we find this: "If *two* are *bound to a feme* by

obligation, and *she marries one of them,* and after he dies, the debt is discharged forever." (*Vin. Abr. Exting.*)

And why should not marriage, in such a case, operate as an extinguishment of the debt? Before the marriage, the debtor has the actual possession of the debt; after the marriage, he has, in addition, the right of possession of it. Is not the marriage, then, equivalent to his reduction of the debt into possession? But whenever the husband reduces the wife's choses in action into his possession, they vest absolutely in him.

But suppose, that when Lord *Coke* says, that "if the *feme* obligee take the obligor to husband, this is a release in law," he only means that it is a *suspension* of the debt—a suspension of it during the marriage, does it follow that the want of somebody to sue and be sued is the reason of such suspension? I say no; for if the wife has a *right* against the husband, she may assert it by a suit against him. If she has a right to a divorce, she may sue him for a divorce; if she has a right against him with respect to her separate property, she may, by the aid of a next friend, assert that right by a suit against him; so, if the wife had a *right* to collect from her husband the debt which he owed her before the marriage, would she not have the right to sue him for that debt? If, then, the debt of the husband to the wife is only suspended during the marriage, can we say that the want of somebody to sue and be sued, is the reason of such suspension?

Suppose the debt be one in which the husband is principal and others are indorsers or sureties, can the husband and wife, after the marriage, sue these indorsers and sureties for the debt? Yet, the case is one in which there are persons who might serve as parties to sue, and persons who might serve as parties to be sued.

But say that the debt is only suspended during the marriage, and that the reason of such suspension is, that the wife cannot sue the husband, what avails it to the support of the argument in question? For as long as the wife cannot sue the husband, so long she cannot sue his indorsers and sure-

ties.  But unless she could do that, how can it be argued
from her case, that the creditors of the corporation, though
unable to sue the corporation, can yet sue the sureties of the
corporation?  The very opposite is to be argued from her
case.  The stockholders in the corporation are but sureties
for the corporation.

So, I draw the same conclusion in this case which I drew
in the case of the debtor made executor.

3. The last case on which the argument I am combatting,
is made to rest, is thus stated: "When one, indebted to the
estate of a lunatic, by speciality, is appointed committee of
the estate, and the specialty is transferred to and received by
him as committee, *the debt is extinguished,* and the securities
to his bond, as committee, are liable for so much money re-
ceived by him."

In reference to this case, I simply ask if the debt is not
also extinguished against the debtor's *co-obligors*—against
the debtor's *sureties?* does not the authority mean to say
that what takes place is equivalent to a reduction of the debt
into the committee's possession—equivalent to a payment by
him to himself of the debt?

Have I not, then, with respect to each of the three cases
on which this head of the argument I am trying to answer
rests, made out my four propositions?  I confidently think
so.  The last of the four is the only one I will repeat.  It is,
that if any conclusion is to be drawn from the three cases, to
the case in hand, it is a conclusion the *opposite* of that which
was drawn in the argument which I am endeavoring to an-
swer.

2. I proceed to notice, in a few words, the first and the last
of the three heads of the argument.  Of these, the first is,
that certain Judges have said that the want of somebody to
sue and be sued is the reason of the rule.  And two Judges
of the Supreme Court of Mississippi are referred to, as the
Judges meant.  The *Bishop of Rochester's case* is also re-
ferred to as a case in which the Court say this is the reason
of the rule.  This case, except as it is found in *Viner's Abridg-*

Robinson *vs.* Lane.

*ment,* is not within my reach.   As it stands in that Abridg-
ment, it contains no such saying of the Court.   (6 *Vin. Abr.*
*Corp.* (*H.* 3) 8.)

What reasons these two Judges had for their opinions, does-
not in the reference appear.   Probably they had none better·
than those which Judge LUMPKIN has given for his opinion.
I leave their opinions to what I have said of his opinion, and
to what more I have to say of it, and to the *decisions* of the
very Court in which they presided—decisions made in *Pres-*
*ident, &c. Port Gibson vs. Moore,* (13 *Smedes & Mar.* 158,)
and in *Coulter et al. vs. Robertson,* (2 *Cushman's R.* 321)—
the first of which decisions was, that a debt of a corporation
is so completely extinguished by the dissolution of the corpo-
ration, as not to be revivable by the revival of the corpora-
tion—a decision which could not have been made if the mere
want of somebody to sue and be sued, had been regarded as
the reason of the rule, for the revived corporation constituted
somebody to be sued.   See, too, my dissenting opinion in 16
*Ga.* 346.

3. The last head of the argument is, that it is the duty of
Courts " to struggle hard to get away from" the word *extin-*
*guished* contained in the rule, because that word, if taken in
its ordinary sense, would make the rule a bad one; and if
Courts hold the want of somebody to sue and be sued to be
the reason of the rule, a way is opened by which they may.
get away from that word.

And first, I cannot admit that it is the duty of Courts to·
" struggle hard to get away from" any clear rule of law.   I
insist, on the contrary, that it is as much the duty of Courts
to give full effect to every clear rule of law, however mischie-
vous they may conceive it to be, as it is to give full effect to
every such a rule, however beneficial they may conceive it to
be.   What power have Courts to change any rule of law?.
None.   There is but one question for a Court: What is the
law ?

But certainly it is not the duty of a Court " to struggle

hard to get away" from one bad rule only to get to another equally as bad. And to go from a rule which says, that on the dissolution of a corporation, all its lands revert, all its goods escheat, all the debts due to it become extinct, all the debts due from it become extinct, to a rule which says, that on the dissolution of a corporation, all its lands revert, all its goods escheat, all the debts due *to* it become extinct, all the debts due *from* it become extinct, *as against itself, but as against its indorsers and other sureties, remain in full force,* is but to go from one bad rule to another.

Now if the proposal were a proposal to go to this rule, viz : that on the dissolution of a corporation, its lands, its goods, its choses in action, become a trust fund, for the payment of its debts, there would be the reason of expediency in favor of the proposal ; for such an exchange would help creditors, and would not hurt sureties and other innocent parties more than they ought to be hurt. And this is the exchange which the Legislature, at its last Session, made. And this is the exchange which Judge *Story,* in one of the *later* editions of work on Equity Jurisprudence, makes, but makes without the aid of any Act of any Legislature. (§1252 *Sto.*) But this, I believe, is an exchange which no member of this Court thinks it competent for any Court in this State, by its own unaided power, to make. And that is the opinion of the Legislature too, as is evinced by the passage of the Act referred to.

I say, then, that it is not the duty of a Court "to struggle hard to get away from" what is the natural and obvious import of this rule, merely to get to what this argument substitutes for that import.

If, therefore, a Court that thinks it its duty to do so, does so, we are but the more admonished to scrutinize the process by which the Court does so.

3. Having thus endeavored to show, that if the want of somebody to sue and be sued be the reason of the rule, this argument is not sufficient to prove it to be so, I proceed to my next main position, which is, that the maxim—the reason

ceasing the rule ceases—has place only when what is the reason is certain beyond a reasonable doubt; and that what is the reason of *this* rule, is not certain beyond a reasonable doubt.

The first of these two propositions is obviously true.

And is not the second almost equally self-evident? Can any man deliberately say that he is certain, beyond a reasonable doubt, as to what is the reason of this rule? This is a rule of the Common Law; and what eye can now penetrate through the layers of darkness, centuries thick, down to the foundations on which the rules of the Common Law are laid? All arguing and debating about what is the reason of a rule of the Common Law, must, of necessity, be more or less of the nature of guess-work.

In relation to this particular rule, I have hazarded my guess as to the reason of it; and that is, that as the previous part of the general rule of which this makes a part, had said that the corporations' lands should revert and its goods escheat, and the debts due *to* it become extinct, or if not, escheat too, so this, the latter part of the rule, had, as a matter of course almost, to say that the debts due from it should be extinguished.

Judge LUMPKIN has come to the conclusion, that another thing is the reason of the rule, viz: the want of somebody to sue and be sued.

Now it seems to me hardly possible for any man who will read over what he has said in favor of his opinion, and what I have said in favor of mine, to affirm that he is certain, beyond any reasonable doubt, that the Judge's opinion is right and mine wrong. But unless the man could say this, would he be justified in following the Judge's opinion, to the setting aside of the plain meaning given by the words of the rule?

4. I pass to my next main position, which is, that if, for any reason, the debt is extinguished or suspended against the *bank*, it is equally extinguished or suspended against the

stockholders of the bank; for they are only the bank's sureties.

It is a general principle, that whenever a debt is in a state of extinguishment or of suspension against the principal, it is in the same state against the surety.

Examples of this we saw in the case of the debtor-executor and that of the debtor-husband; in both of which cases, we saw that if the debt was extinguished or suspended against the debtor, it was also extinguished or suspended against the debtor's sureties.

These are but examples. The rule is a general one. (See *Vin. Abr. Exting. M.*)

That the stockholders are but sureties for the bank, I think I have, in a previous part of this opinion, shown.

5. May there not be some other reason sufficient to take this case out of the rule, as to extinguishment?

The judgment of forfeiture was not such a judgment as the Act of the Legislature directed the Court to pronounce. The words of that Act are: "The Judge shall pronounce the judgment of the dissolution of said corporation, for all purposes whatsoever, saving and excepting as to its power, in its corporate name, to collect and pay its debts, and to sell and convey its estate, real and personal." Instead of pronouncing such a judgment as that thus pointed out by the Act the Court passed a general judgment of seizure and ouster. At least, so I have considered myself justified in assuming. It was said, in the argument, that the Court's reason for doing this was, that the Court considered the aforesaid words of the Act to be unconstitutional.

For ought that appears, both parties, the State and the bank, acquiesced in this judgment. It does not appear that any attempt has been made to set it aside, and it is now twelve years old.

Under these circumstances, the question is, does this judgment have validity?

I say yes. I say it must be considered valid, until it is set aside.

In *Bostwick vs. Perkins et al.* this Court say: "Where the Court in which the judgment is rendered, has *no jurisdiction*, either of the person or the subject-matter of the suit, then the whole proceeding is unquestionably void and a nullity; but where the Court *has jurisdiction*, both of the person and the subject-matter of the suit, although it may err in its opinion of the law, yet, such judgment is conclusive upon the parties to it, where there is no appeal." (4 *Ga. R.* 49.)

This is repeatedly affirmed by the Court. (*Rogers vs. Evans*, 8 *Ga. R.* 145; *Preston vs. Clark*, 9 *Ga. R.* 244; *Mobley and others vs Mobley*, 9 *Ga. R.* 247.)

That the Court had in this case, jurisdiction of the person and of the subject-matter, there can be no doubt; therefore, its judgment, even if erroneous, must bind until it is set aside.

This Act of the Legislature, then, does not have the effect to take the case out of the rule.

Does there exist any other thing which could be thought to have that effect? Not within my knowledge.

What, then, is the state of the argument between Judge LUMPKIN and me? This:

There is a rule of law which says, that on the dissolution of a corporation, its debts are extinguished. This we both admit.

This rule means, I think, that the debts are *annihilated*. *Annihilated* is the etymological, the common and the technical meaning of "*extinguished.*" The rule in this sense, has been, in a number of cases, applied to the debts of a dissolved corporation.

The rule, as he thinks, does not mean that the debts of a dissolved corporation are annihilated, or mean anything which, in the least, affects the debts, as to other parties to them, than the dissolved corporation itself; and this opinion he puts on what he conceives to be the reason of the rule—a want of some one to sue and be sued.

I meet him, by insisting that Courts cannot set aside the plain sense of the words of a rule of law, upon what they may conceive to be the reason of the rule; that, at least, they can-

not do so, unless it is certain what is the reason of the rule; and I show, I think, that what he conceives to be the reason of this rule, cannot be the reason of it; or, at least, that it is doubtful whether that is the reason of it or not. And I further show, I think, that even if that be the reason of the rule, yet, as the debt, as against the *bank*, is within the rule, it must be within it as against the stockholder.

This being, as it seems to me, the state of the argument between us, I feel constrained to stick to the plain words of the rule.

Upon the whole, therefore, my conclusion is, that the case is within the rule. If it is within the rule, the Court should have given the charge which it was requested to give.

The judgment of the majority of the Court being, that the Court below was right in refusing to give the charge, I am forced to dissent from that judgment.