**Simon Rosenfeld et al., Appellees, v. Bernard Horwich et al. C. W. Dempster, Appellant.**

**Gen. No. 25,681.**

1. BANKS AND BANKING—*when person not liable as stockholder on certificate issued without his knowledge or consent.* The liability of a stockholder in a state bank may not be imposed upon one by including his name in a list of subscribing stockholders filed with the auditor of public accounts and recorded in the office of the recorder of the county, and by making out a stock certificate in his name, all without his knowledge and consent.

2. BANKS AND BANKING—*duty of person certified to auditor as a subscriber to stock to disavow.* One who was shown by the organizer of a state bank a certificate of stock in his name and was told that it was the stock of another person who wanted it issued that way, was immediately charged with knowledge of the fact that he had been represented to the state auditor as a subscriber to the stock of the bank to that extent and that, on the strength of that representation, the auditor had issued the bank's charter which enabled it to transact business and, if he did not wish to confirm that situation, it was incumbent upon him immediately to notify the auditor to that effect.

3. BANKS AND BANKING—*liability of person permitting issuance of stock in his own name for convenience of another.* One who was shown a certificate of stock in a state bank which was in his

name and was told that the stock belonged to another who wished it to be made out in that way and was asked to receipt for it and assign it in blank, which he did, and left it to be transferred to the true owner, ratified the original issuance of the stock to himself and at once assumed the superadded constitutional liability on the stock so far as it might become necessary to liquidate liabilities of the bank accruing from the date of issuance of such stock until it was actually transferred on the books of the bank.

4.    EQUITY—*liability for fees of master.*    In a suit on behalf of creditors of a bank to enforce the constitutional superadded liability of stockholders, the circuit court properly decreed the payment of the master's fees by the defendants who filed answers denying the allegations of the bill and appeared before the master and unsuccessfully contested the suit.

5.    APPEAL AND ERROR—*right to complain of collateral orders.* An appellant, from a decree finding him liable for the superadded constitutional liability of a stockholder in an insolvent bank, is not in a position to question on appeal an order of the trial court directing that the receiver pay out of the first money coming into his hands certain master's fees and a sum to the solicitors for complainants, where the order was no part of the decree and it did not appear from the record that it was entered over appellant's objection nor that an appeal was prayed from it.

O'CONNOR, J., dissenting.

Appeal from the Circuit Court of Cook county; the Hon. CHARLES M. WALKER, Judge, presiding.    Heard in the Branch Appellate Court at the October term, 1919.    Affirmed.    Opinion filed June 18, 1921.    *Certiorari* denied by Supreme Court (making opinion final).

ASHCRAFT & ASHCRAFT, for appellant; E. M. ASHCRAFT, of counsel.

JACOB LOGAN FOX and NATHAN S. BLUMBERG, for appellees.

MR. JUSTICE THOMSON delivered the opinion of the court.

This bill in equity was filed by the complainants, in behalf of themselves, and all other creditors, of the Ashland-Twelfth State Bank, organized under the Banking Act of Illinois, by which they sought to en-

force the superadded constitutional liability of the stockholders of the bank. This bank seems to have been organized as a feeder for the LaSalle Street Trust & Savings Bank. Mr. Charles B. Munday, one of those chiefly interested in the LaSalle Street Trust & Savings Bank, was the president of the Ashland-Twelfth State Bank. Munday and his associates applied to the State Auditor for permission to organize the said bank and, pursuant to that application, a license and permission to organize was granted on October 13, 1913. The appellant Dempster duly subscribed for five shares of stock. When the representative of the State Auditor was shown the list of subscribing stockholders, it showed Mr. Munday as subscribing for 1,505 shares out of the total of 2,000 shares. Objection was thereupon made by the Auditor's representative that this was too great a proportion of the total amount of the stock to be held by Munday. Thereupon one Potts, who had been engaged by Munday to organize the bank and who was elected its vice-president, consulted with Munday and a new list of subscribing stockholders was made out, apparently in the presence of the Auditor's representative, and in this list Munday was shown as subscribing for 110 shares and the balance was split up among a number of other people, and among them Dempster was shown as subscribing for 155 shares, the subscription price of which was $15,500. This list of subscribing stockholders was duly filed in the office of the State Auditor and a copy thereof was filed in the office of the Recorder of Deeds of Cook County, as required by the statute, on December 10, 1913. Dempster paid in full for the five shares of stock for which he had subscribed. Certificates of stock were made out and issued to the subscribing stockholders as shown on the list filed with the State Auditor. On February 11 or 12, 1914, Dempster went to the bank in response to a call from Potts advising

him that the stock certificates were ready for delivery and requesting him to come and get his. Upon that occasion Potts delivered to Dempster certificate No. 44, for the 5 shares of stock for which he had subscribed, and Dempster receipted for it on the stub. Potts then showed Dempster certificate No. 45 for 150 shares which had also been issued to him and requested him to receipt for that also. Dempster inquired what that was for and Potts replied that it was "Mr. Munday's stock, but he kind of wanted it done this way,—issued in your name and to be transfered immediately to him." On direct examination, Dempster testified, "I declined at first, but I eventually signed it, and also the stub for the certificate." That is, Dempster receipted for that certificate on the stub in the stock certificate book and he also indorsed the certificate in blank and left it with Potts for transfer, as indicated by the latter. On cross-examination, Dempster testified that he had subscribed for no stock other than the five shares; that he knew nothing of the 150 shares certificate until he had his talk with Potts, above referred to; that he "declined at first to receipt for or endorse the certificate, when he explained to me that he would like to have it done, so it was done at his instigation, and I said, 'Very well, I will do it.'" Later, in his cross-examination, he was asked, "What did Mr. Potts tell you was his reason for having you sign the stock certificate?" and he answered, "To accommodate Mr. Munday." He was then asked, "And you did that to accommodate Mr. Munday?" and he answered, "I did, yes; but rather unwillingly." He further testified that he later telephoned Potts once or twice to see if the stock in question had been transferred to Munday and that Potts said that he would have it done in a short time and still later he wrote a note and that the latter replied that the stock had been transferred. This stock was transferred to Munday on March 10, 1914. The bank

failed in June, 1914, and on a bill later filed by the State Auditor, the bank was dissolved and a receiver was appointed to take charge of all the assets of the bank and the receiver was directed to convert the assets into money and to distribute the same among the creditors of the bank as they might be made to appear, the balance remaining, if any, to be distributed among the persons found to be stockholders of the bank at the time of its dissolution, according to their respective holdings. The bill involved in the case at bar was then filed. No question is raised on this appeal of the superadded constitutional liability of the stockholders of the bank, and the appellant Dempster did not contest such a liability on his part, so far as the 5 shares of stock for which he subscribed were concerned, but he did contest such liability so far as the 150 shares of stock, to which we have referred, were concerned, not on the ground that the debts of the bank remaining unpaid had not accrued while he held the stock in question, but on the ground that he was never the holder of that stock so as to be subject to the constitutional provision as to a stockholder's superadded liability. The cause was duly referred to a master and, after a hearing, the master held that Dempster was the holder of the stock in question up to the time it was transferred to Munday on March 10, 1914. Exceptions to the master's report were overruled by the court and a decree was entered in which the court found, among other things, that when the Auditor's representative was shown a list of subscribers to the stock, which showed 1,505 shares in the name of Munday, he stated that 1,505 shares was too much stock in the name of one man and suggested that those shares be divided up; that in order to procure the issuance of a charter to the bank, 150 shares of the stock, being part of the 1,505 shares subscribed for by Munday, were issued on December 12, 1913, by Potts, at the direction of Munday, in

the name of Charles W. Dempster as certificate No.
45; that Dempster had previously subscribed for 5
shares, which were issued on December 12, 1913; that
in the list of stockholders filed in the office of the
Auditor and in the Recorder's office, Dempster was
certified by the officers of the bank to be the owner and
holder of 155 shares of the stock; that on February
12, 1914, Dempster adopted and ratified the issuance
of 150 shares of stock to him, represented by certifi-
cate No. 45, and acquiesced in and assented to the
original issue of said 150 shares to him; that the
bank was located in a building owned by Dempster's
father; that on the books of the bank and in the rec-
ords on file in the office of the Recorder of Deeds
and in the office of the Auditor of Public Accounts,
he was held out and represented to be the owner of
155 shares of stock from the date of organization to
March 10, 1914, and is liable to the creditors of said
bank as the holder of 155 shares and the appellant
was decreed to pay the appellees $15,500. To reverse
this decree the appellant Dempster has perfected this
appeal.

Section 6 of article XI of our State Constitution
provides that "Every stockholder in a banking cor-
poration or institution shall be individually respon-
sible and liable to its creditors, over and above the
amount of stock by him or her held, to an amount
equal to his or her respective shares so held, for all
its liabilities accruing while he or she remains such
stockholder."

Of course, the liability of a stockholder in a State
bank may not be imposed upon one, by including his
name in the list of subscribing stockholders filed with
the Auditor of Public Accounts and recorded in the
Recorder's office of the county and by making out a
stock certificate in his name, all without his knowledge
or consent. Therefore, up to February 1, 1914, Demp-
ster had in no way become subject to the superadded

stockholder's liability imposed by the constitution, so far as the 150 shares of stock were concerned. The question presented for decision on this appeal is whether the course pursued by Dempster, when he learned that this stock had been issued to him, was such as to subject him to the liability referred to. The proof in the record is such as to charge him with knowledge of the fact that as to this stock for which he had in fact not subscribed, he had been represented in the list of subscribing stockholders, filed with the Auditor and also in the Recorder's office, as a subscriber and that the stock certificate book of the bank, which was its official record of the holders of its stock, was to the effect that the stock in question was held by him.

Situations similar to the one involved in the case at bar have frequently been presented to the courts for adjudication. In *Kenyon v. Fowler*, 155 Fed. 107, one Reynolds, a broker, bought certain stock in a national bank for one Ratchford but had it issued in the name of Kenyon. He then took the stock certificates to Kenyon and told him that it was Ratchford's stock, that the latter wanted it put in Kenyon's name and he requested Kenyon to put his name on the back of the certificates and assign them in blank, which he did. The certificates were then delivered to and kept by Ratchford, without any record of this assignment being made on the records of the bank. It was held that Kenyon could not avoid liability for an assessment on the stock, made by the comptroller to meet the debts of the bank after its insolvency. In this case the defendant Kenyon, with full knowledge of the facts, "not only failed to repudiate the action of Reynolds in having the shares taken in his name, but took no steps to have them registered in the name of the true owner." In *O'Connor v. Witherby*, 111 Cal. 523, Witherby was a stockholder in a national bank. Certain stock was also in the name of the wife

of the president of the bank, one Howard. The latter had his wife's stock transferred to Witherby and apparently procured the indorsement of the latter on the certificate issued to him, for some fraudulent purpose. Witherby contended that he did not know that Mrs. Howard's stock had been transferred to him and he had not authorized a certificate of that stock to. be issued to him. The court said: "Of course, a man cannot be made liable to the creditors of a bank merely because, without his knowledge and under circumstances which did not put him on inquiry, someone had, without authority, caused some stock to be issued in his name. But in the case at bar, in the first place, appellant, during all the time of these transactions was a stockholder, a director and vice president of the bank, attended director's meetings and gave advice as to the bank's business, and certainly ought to have known his relations to it. He held himself out as sustaining the bank and indorsing its solvency. And, in the second place, he indorsed these very two certificates with his name, in his own handwriting; and this is conclusive proof by his own admission that he knew or ought to have known that they had been issued to him. He was one of the persons to whom the creditors ·of the bank had the right to look for the purpose of giving it credit, and he has shown nothing which enables him to escape from that position. * * * As to the creditors of the bank, appellant was the owner of the stock. With secret transactions between him and Howard they are not concerned."

In *Abbott v. Jack,* 136 Cal. 510, it was held that where the stock book of a corporation shows that a certificate of stock was issued in the name of a wife sued as defendant on her statutory liability (the California statute declaring one to be a stockholder whose name appears on the books of the corporation as such), and stood for 3 years on the books of the

company in her name, and her acceptance of the certificate was shown by her written assignment of it' to her husband 2 days after its issuance, the fact that she continued to appear as a stockholder on the books of the company, in the absence of any facts found to exonerate her, is sufficient to render her liable as a stockholder, along with her husband.

The difference between the liability of holders of stock in national banks and the liability of holders of stock in state banks in Illinois is not such as to make those decisions involving the former, to which we refer, inapplicable to the issue involved in the case at bar. *Keyser v. Hitz*, 133 U. S. 138, is such a case. There the stock book of the bank showed certain transfers of stock of Jane C. Hitz, at a time when her husband was the president of the bank, but the evidence did not show that the certificates issued to her were ever delivered to her, nor that they were ever in her possession, nor that she knew they had been issued to her, but the evidence did show that certain dividend checks had been drawn to her order and had been indorsed by her and that subsequently they had been deposited to the credit of her husband in his personal account. The question was as to her liability as a stockholder for an assessment made by the Comptroller of the Currency on the stockholders of the bank. In holding that she was so liable, the court said that if she indorsed the dividend checks referred to "she is estopped to say that she did not know their contents, and was not the owner of the shares of stock upon which the dividends were declared. * * * If, after the transfers (of stock), she joined in the application to convert the savings bank into a national bank, *or in any other mode approved, ratified or acquiesced in such transfers,* or accepted any of the benefits arising from the ownership of the stock thus put in her name on the books of the bank, she was liable to be treated as a share-

holder, with such responsibility as the law imposes upon the shareholders of national banks.''

In the case of *Golden v. Cervenka,* 278 Ill. 409, our Supreme Court held that each stockholder of the La Salle Street Trust & Savings Bank, both those who were such at the time the bank suspended, and those who had ceased to be such before the time the bank suspended, was liable to the creditors of the bank for an amount equal to the par value of his stock so far as that was necessary to liquidate credits which had been extended to the bank or liabilities which the bank had incurred during the time such persons remained stockholders. In so holding, the court said: ''Section 6 of the Banking Act [J. & A. ¶ 678] declares the liability of stockholders as fixed by the constitution, provides for a public record of all the stockholders, with the number of shares held by each, and requires a certificate of all transfers to be recorded not later than 10 days after such transfers. The object of this record is to give information as to the names of the stockholders, and the persons dealing with the bank have a right to rely upon the list of stockholders shown by the record. The stock can be transferred only on the books of the association, and only those persons have the rights and liabilities of stockholders who appear to be such on the books of the association. *The stockholder registered as such on the books of the bank can be relieved from liability only by a transfer of his stock on the books.* * * * A creditor is entitled to hold him liable as a stockholder who appears on the books of the corporation to be the legal owner of the stock. * * * The record by which it is determined who are the stockholders of the bank is the record of the bank itself. * * * The stockholders are liable, not because of actual notice to any particular creditor that any particular person is a stockholder, but because the law imposes the liability, and the record in the Recorder's

office is for the convenience of persons dealing with the bank in ascertaining who are the stockholders." In the opinion of the Supreme Court in that case, the court does say further, as counsel for appellant points out, that "at least he (the stockholder) must comply with the requirements of such transfer and make a demand upon the officials of the bank that it be made." It is appellant's principal contention that in leaving the certificate for 150 shares with Potts, the vice president of the bank, to be transferred to Munday, and in later following the matter up by getting into communication with Potts to see if the stock had been transferred and in looking up the records in the Recorder's office for the same purpose, he relieved himself from all responsibility as to creditors. It seems that whatever Dempster did after he had receipted for the stock and assigned the certificates could have no effect on his superadded constitutional liability, so far as the liabilities of the bank are concerned, which accrued from the time the stock was issued (December 12, 1913) up to the time Dempster receipted for it. As far as subsequent liabilities of the bank are concerned, in the first place, what the appellant did fell far short of a "demand upon the officials of the bank" that the transfer be made. The evidence does not disclose what the appellant said to Potts on the occasion of his communications. From all that appears in the record he may have communicated with Potts merely to see if the transfer had been made. In the second place, in a case such as this, where this point is squarely presented for decision (as it was not in the case of *Golden v. Cervenka*), we think it must be held that *"the stockholder registered as such on the books of the bank can be relieved from liability only by a transfer of his stock on the books."*

Such a holding, of course, contemplates that the stockholder has become such with his consent or acquiescence. If, instead of receipting for the 150

shares of stock and indorsing it, for the very apparent accommodation of Munday, the appellant had publicly repudiated the issuance of that stock to him in some suitable manner, as by filing his affidavit to that effect in the Recorder's office, with a demand that the certificate in question be immediately canceled, he would never have become a holder of that stock with his consent or acquiescence and would never have incurred the liabilities of a holder of that stock. When appellant was told by Potts that this certificate for 150 shares had been issued to him, and that this was Munday's stock and that he wanted it issued that way, he was immediately charged with knowledge of the fact that he had been represented to the State Auditor as a subscriber to the stock of the bank to the extent of 155 shares and that on the strength of that representation the State Auditor had issued the bank's charter which enabled it to proceed to transact business, and if he did not wish to confirm that situation, it was incumbent upon him to immediately notify the Auditor to that effect. If he had done so, the losses that have been incurred by the thousands of the depositors through the bank's failure would doubtless have been prevented. At least, appellant would not have incurred a stockholder's liability to such creditors as far as this stock is concerned.

In the case of *Robinson v. Lane,* 19 Ga. 337, certain stock in the Planters' & Mechanics' Bank of Columbus, was issued to one Robinson without his knowledge. When he discovered it he went to the transfer agent and expressed his surprise and objected, and he was told that the stock had been transferred to him for the benefit of one McDougald. Robinson then saw McDougald and told him that the stock must be transferred to someone else. Nothing was done for some time, however, and ultimately Robinson himself transferred the stock to the bank. After the failure of the bank, the lower court, in hold-

ing Robinson subject to liability as a stockholder, said, with reference to Robinson's contention that the shares had been transferred to him without his consent, "the duty which the defendant owed to himself and to the public required that he should have had it immediately canceled. * * * Furthermore, the cashier was not the proper person to whom the defendant should have complained—to the president and directors he should have gone, and repudiated the transfers, and had the matter set right. If he did not do this, and suffered his name to be published again and again as the owner, he is liable on the stock as if he were the owner." The decision of the lower court was affirmed by the Supreme Court, the court saying, that if the jury believed that after the fact that the stock had been transferred to the defendant was brought to his knowledge, "the stock stood in his name, he acquiesced in the transfer for the accommodation of McDougald, then he is presumptively liable for" the debts of the bank incurred "before he retransferred the stock to the bank. * * * The transfer book, we think, was properly admitted to go before the jury, and its materiality was strengthened in this case, inasmuch as Robinson subsequently reconveyed to the bank, thus acknowledging, that by virtue of the transfer (to him), the legal title to the stock was in him, and that the bank recognized him as the owner." There were several dissenting opinions filed in that case, on assignments of error in no way involved in the question on which we have quoted the court's opinion, which is much the same question as is involved in the case at bar.

In *McHose & Co. v. Wheeler*, 45 Pa. St. 32, the court said: "The charter and the previous certificate being public acts and publicly recorded, if any person named therein as a member afterwards acts as member, or does not disavow the relation as soon as he discovers the use made of his name, he cannot evade his liability

as a member, merely by showing that he was not in fact a subscriber, and never paid in any stock. He must immediately and publicly disavow the act, or else be deemed as ratifying it as relates to creditors."

In *Bartlett v. Stephens,* 137 Minn. 213, the court held that a stockholder, who had been induced to become such by fraud on the part of the corporation, could not relieve himself of his liability for debts of the corporation by notice of rescission and tender of return of the stock and an executory agreement of the corporation to accept the surrender. The court said that if "a person voluntarily assumes the relation of stockholder, and voluntarily procures or permits his name to be recorded as such on the corporate records, he fixes his own status and is liable for the consequences. * * * It is proper to say of a person who voluntarily assumes the relation of stockholder that he is subject to liability because the constitution has fixed the liability of all stockholders and he is liable as long as he holds his stock and is a stockholder in fact, even though he may have a remedy for fraud by which he was induced to acquire his stock. * * * When the corporation becomes insolvent, the rights of creditors become vested * * * and those who have permitted themselves to continue in that relation cannot directly or indirectly release themselves or discharge their liability as such by means of agreements with one another or with the corporation." The court proceeds to suggest that such a stockholder might relieve himself from liability if he "takes seasonable steps, while the corporation is a going concern, to rescind and to purge the corporation records of his name as a stockholder," citing cases holding that the commencement of an action for that purpose is sufficient. The court says further that one who becomes a stockholder unwillingly or through some fraud practiced upon him "is nevertheless estopped as against creditors to deny that he

is a shareholder, if, at the time the rights of creditors accrued, he voluntarily occupied and was accorded the rights appertaining to that relation.   *   *   *   A very different rule of diligence is required between him and the creditors than is required as between him and the corporation.   It is his duty to use a high degree of care and diligence to see that creditors are not misled by his conduct.''   The court held, as a matter of law, that the defendants there involved were liable as stockholders to the creditors of the corporation, as they had taken ''no effective steps to secure a cancellation of their stock,'' during the period the stock stood in their names, when the corporation was doing business and incurring debts.

We have examined the numerous cases called to our attention by appellant with great care but, in our opinion, they do not pertain to the issue presented here.   A case on which appellant lays great stress is the case of *Whitney v. Butler*, 118 U. S. 655.   That case involved the liability of a person appearing on the records of a national bank as a shareholder of the bank, at the time of its failure.   It in no way involved such a liability as is invoked in the case at bar.   There, one Coburn wished to acquire stock in the bank in question.   One Eager was employed to purchase stock for Coburn from the defendants.   The stock was purchased and Coburn paid for it and the defendants indorsed the certificates in blank and delivered them to the bank to have them transferred. The court held that the defendants did everything to procure a transfer that a careful prudent business man would have done under the circumstances and they were to be exempted from further responsibility for existing debts.   The only question before the court in that case involved the future responsibility of the defendants after a sale in good faith.   Even as to that question, we are of the opinion that the decision would have to be against the defendants under such a pro-

vision as our constitution contains, for reasons we shall refer to later. That case had nothing whatever to do with the question which is involved here as to the antecedent constitutional liability to which one subjects himself the moment he acquiesces in the issuance of stock to him, when he discovers that such stock has been previously so issued, as the appellant Dempster did in the case at bar.

Another case relied upon by appellant is *Welch v. Gillelen*, 147 Cal. 571. In that case the defendant loaned money to certain persons to enable them to buy stock in a corporation, agreeing to take the stock to be purchased and hold it as collateral for the loan. The secretary of the company, in violation of the defendant's instructions and without any authority, issued a certificate for the stock to the defendant individually and not as a pledgee and the records of the corporation contained notations accordingly. The defendant discovered the error and on the following day went to the secretary demanding that the records be corrected to show the issue of the stock to him as pledgee. The secretary said he could not correct the error then, in the absence of other officers of the corporation. The defendant called on the secretary again within a week, with the same result, and this happened several times and finally the change in the certificate was made and the error corrected. The court referred to the statute, declaring one to be a stockholder whose name appears on the books of the corporation to be such and said that that "means one who knowingly or voluntarily permits his name to appear thereon as a stockholder. * * * The relation of stockholder to a corporation is one of contract, either express or implied. It only exists when a party has either expressly consented to become a stockholder, or his conduct is such that in law his consent will be implied." It was contended that in that case by accepting and retaining the certificate, the defendant had ratified

the action of the secretary, and by failing to use ordinary diligence to have his apparent relation as stockholder to the corporation effaced on the corporate books and changed in the certificate, he was estopped as against creditors from disclaiming that he was a stockholder. The court held otherwise, saying that in retaining the certificate the defendant had not ratified its issuance in its erroneous form, in view of his persistent disavowal and repudiation of it in presenting it to the secretary for correction and that the defendant was not guilty of laches. There are a number of respects in which the case referred to is totally different from the case at bar. In that case the defendant signed no receipt for the issuance of the stock nor did he indorse the certificate and deliver it back for transfer or commit any other act of affirmance of the issuance of the stock to him, in the form in which it had been issued, with knowledge that, on the strength of such issuance, a charter had been issued to the company, enabling it to proceed to do business. The case cited might be more in point if, upon being presented with the certificate in question, Dempster had not receipted for and indorsed it, but had demanded that it be canceled at once and a new certificate issued to Munday.

In the case at bar the certificate of stock in question for 150 shares of stock was in fact issued to Dempster, under date of December 12, 1913. When on February 11, 1914, that certificate of stock was presented to him and he was asked to receipt for it and assign it in blank, with the explanation that it was a part of Munday's stock which Munday had requested be issued in this way, he at first declined to do so. That refusal on his part was doubtless prompted by a desire to avoid liability. But he finally consented to comply with the request, as he himself testified, "to accommodate Mr. Munday,—but rather unwillingly." The very moment the appellant Dempster receipted for this certifi-

cate and indorsed it in blank and left it with Potts for transfer to Munday, he ratified and acquiesced in its original issuance to him under date of December 12, 1913, and he at once assumed his superadded constitutional liability on that stock, so far as might be necessary to liquidate all its liabilities which had accrued after that date and up to February 11, 1914, when he so affirmed and acquiesced in the issuance of the stock to him,—and this without any regard whatever to what he did or did not do in the way of having the stock transferred to Munday on the books of the bank. The latter question could only affect his superadded constitutional liability on the stock, so far as might be necessary to liquidate the liabilities of the bank accruing subsequently and before the stock actually was transferred on the books of the bank. On that question it seems clear that no matter what Dempster did in that regard, under the language of our constitutional provision, his superadded liability on this stock applied to all indebtedness of the bank accruing up to the time the stock was actually transferred to Munday on the books of the bank, which was March 10, 1914. The language of our constitution is simple and clear. It is to the effect that the superadded liability of the stockholder of a bank shall apply to "all its liabilities accruing *while he or she remained such stockholder.*" It seems idle to contend that Dempster "remained such stockholder" after he became a holder of this 150 shares of stock in the manner referred to, only until he handed the certificate to Potts for transfer or until he later made inquiries as to whether it had been transferred. He clearly "remained such stockholder," until the stock was actually transferred to Munday on the books of the bank. In *Faulkner v. Bank of Topeka*, 77 Kan. 385, the court said: "There must in all cases be a registered holder for every share of bank stock, and, if a registered holder dispose of his stock, he will continue to be the registered holder

until the transfer is made on the books of the bank. An assignee of a registered holder who has not caused the transfer to be made on the books of the bank may be entitled to the rights of a registered holder as against his assignor, but the bank itself and the creditors of the bank, ignorant of the assignment, may rely upon the record." To the same effect are *Plumb v. Bank of Enterprise,* 48 Kan. 484, and *Man v. Boykin,* 79 S. C. 1. In those jurisdictions there are statutes to the effect that no transfer of stock shall be valid except as between the parties thereto until they have been regularly entered on the corporation records. While we have no such express statutory provision in Illinois, our Supreme Court, in construing certain statutory provisions on the question of the levying of an execution and their applicability to a levy on corporation stock, has held that "It is too obvious to justify extended comment, that these provisions contemplate that, as against a judgment creditor, title to the stock can only pass by transfer on the books of the company, for if it might be otherwise transferred, as, by indorsement and delivery of the certificates alone, these provisions could have no practical operation." *People's Bank of Bloomington v. Gridley,* 91 Ill. 457. In construing the same statutes in *People ex rel. Adams v. Goss & Phillips Mfg. Co.,* 99 Ill. 355, the court said that the title to stock of a corporation, as evidenced by a stock certificate, can be passed from one to another "only by a transfer thereof upon the stock books of the corporation. * * * Until that transfer is made, the possession of the corporation is the possession of him in whose name the stock stands upon the books."

That such is a correct statement of the law with regard to bank or other corporation stock, so far as it affects creditors generally, is, in our opinion, "too obvious to justify extended comment."

We hold that, for the reason stated, the appellant be-

came a holder of the 150 shares of stock in question, and that his superadded constitutional liability on that stock was incurred by him as to all the liabilities of the bank accruing while he "remainded such stockholder," namely, from December 12, 1913, to March 10, 1914.

Appellant further complains of that part of the decree of the circuit court directing him to pay the master's fees in the sum of $401.45. The decree taxed the master's fees at the sum of $1,134.63 and directed that it be paid by the defendants who had filed their objections and exceptions to the master's report, each of said defendants paying his pro rata share, according to the amount of his liability as fixed by the decree, these defendants having filed answers denying the allegations of the bill and appeared before the master and unsuccessfully contested the suit. In our opinion that situation fully justified the part of the decree relating to the payment of the master's fees. As to the amount allowed the master as fees, it appears to be entirely warranted by the itemized schedule attached by the master to his report.

Appellant also complains of an order of the court which directed that the receiver pay, out of the first moneys coming into his hands, certain master's fees, and also the sum of $5,000 to solicitors for complainants on account of their fees. The appellant is not in a position to raise any question in this court affecting that order as it was no part of the decree and it does not appear from the record that it was entered over appellant's objection nor that an appeal was even prayed from it.

For the reasons stated the decree of the circuit court is affirmed.

*Affirmed.*

TAYLOR, P. J., concurs.

O'CONNOR, J., dissenting.

I cannot agree with the affirmance of the decree in this case. The only theory on which Dempster could he held liable is that he ratified the unauthorized act of others when they fraudulently changed the subscription list showing that he had subscribed for 155 shares when, in fact, his subscription was for but 5 shares. The undisputed evidence is that Dempster did not know that the record showed that he had subscribed 155 shares until February 11, 1914, when he called on Potts, the vice president of the bank, to obtain his certificate for the 5 shares for which he had subscribed and paid. At that time, after he had receipted for his certificate for 5 shares, Potts told him there was another certificate for 150 shares. This was the first knowledge Dempster had of this fact. The stock did not belong to him but Potts told him it was C. B. Munday's. Dempster demurred and Potts then told him he wanted him "to endorse it so it could be transferred." Dempster testified that Potts said he would "see to it that it was transferred immediately." He further testified that he then, rather unwillingly, receipted for and indorsed the stock "to accommodate Mr. Munday." Upon a consideration of the record, I am of the opinion that the evidence warrants the conclusion that what Dempster did was in repudiation of the fraud that had been practiced upon him and not in ratification of it. This was the substance of the transaction and substance should control over mere form. *Glenn v. Garth*, 133 N. Y. 18; *Whitney v. Butler*, 118 U. S. 655; *Welch v. Gillelen*, 147 Cal. 571.